WHITLEY, INDIVIDUALLY AND AS ASSISTANT SUPER-
INTENDENT, OREGON STATE PENITENTIARY,
ET AL. v. ALBERS

No. 84–1077.   Argued December 10, 1985—Decided March 4, 1986

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL, and REHNQUIST, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN and BLACKMUN, JJ., joined, and in all but n. 2 of which STEVENS, J., joined, *post*, p. 328.

*Dave Frohnmayer*, Attorney General of Oregon, argued the cause for petitioners. With him on the briefs were *William F. Gary*, Deputy Attorney General, *James E. Mountain, Jr.*, Solicitor General, *Virginia L. Linder*, Assistant So-

licitor General, and *Robert M. Atkinson*, Assistant Attorney General.

*Gene B. Mechanic*, by appointment of the Court, 474 U. S. 809, argued the cause and filed a brief for respondent.*

JUSTICE O'CONNOR delivered the opinion of the Court.

This case requires us to decide what standard governs a prison inmate's claim that prison officials subjected him to cruel and unusual punishment by shooting him during the course of their attempt to quell a prison riot.

I

At the time he was injured, respondent Gerald Albers was confined in cellblock "A" of the Oregon State Penitentiary. Cellblock "A" consists of two tiers of barred cells housing some 200 inmates. The two tiers are connected by a stairway that offers the only practical way to move from one tier to another.

At about 8:30 on the evening of June 27, 1980, several inmates were found intoxicated at the prison annex. Prison guards attempted to move the intoxicated prisoners, some of whom resisted, to the penitentiary's isolation and segregation facility. This incident could be seen from the cell windows in cellblock "A," and some of the onlookers became agitated because they thought that the guards were using unnecessary force. Acting on instructions from their superiors, Officers Kemper and Fitts, who were on duty in cellblock "A," ordered the prisoners to return to their cells. The order was not obeyed. Several inmates confronted the two officers, who were standing in the open area of the lower tier. One inmate, Richard Klenk, jumped from the second tier and assaulted Officer Kemper. Kemper escaped but Officer

---

*Acting Solicitor General Fried, Acting Assistant Attorney General Willard, Deputy Solicitor General Geller,* and *Andrew J. Pincus* filed a brief for the United States as *amicus curiae* urging reversal.

*Steven Ney* and *Michael Mushlin* filed a brief for the Correctional Association of New York et al. as *amici curiae* urging affirmance.

Fitts was taken hostage. Klenk and other inmates then began breaking furniture and milling about.

Upon being informed of the disturbance, petitioner Harol Whitley, the prison security manager, entered cellblock "A" and spoke with Klenk. Captain Whitley agreed to permit four residents of cellblock "A" to view the inmates who had been taken to segregation earlier. These emissaries reported back that the prisoners in segregation were intoxicated but unharmed. Nonetheless, the disturbance in cellblock "A" continued.

Whitley returned to the cellblock and confirmed that Fitts was not harmed. Shortly thereafter, Fitts was moved from an office on the lower tier to cell 201 on the upper tier, and Klenk demanded that media representatives be brought into the cellblock. In the course of the negotiations, Klenk, who was armed with a homemade knife, informed Whitley that one inmate had already been killed and other deaths would follow. In fact, an inmate had been beaten but not killed by other prisoners.

Captain Whitley left the cellblock to organize an assault squad. When Whitley returned to cellblock "A," he was taken to see Fitts in cell 201. Several inmates assured Whitley that they would protect Fitts from harm, but Klenk threatened to kill the hostage if an attempt was made to lead an assault. Klenk and at least some other inmates were aware that guards had assembled outside the cellblock and that shotguns had been issued. Meanwhile, respondent had left his cell on the upper tier to see if elderly prisoners housed on the lower tier could be moved out of harm's way in the event that tear gas was used. Respondent testified that he asked Whitley for the key to the row of cells housing the elderly prisoners, and Whitley indicated that he would return with the key. Whitley denied that he spoke to respondent at any time during the disturbance. Tr. 380.

Whitley next consulted with his superiors, petitioners Cupp, the prison Superintendent, and Kenney, the Assistant

Superintendent. They agreed that forceful intervention was necessary to protect the life of the hostage and the safety of the inmates who were not rioting, and ruled out tear gas as an unworkable alternative. Cupp ordered Whitley to take a squad armed with shotguns into cellblock "A."

Whitley gave the final orders to the assault team, which was assembled in the area outside cellblock "A." Petitioner Kennicott and two other officers armed with shotguns were to follow Whitley, who was unarmed, over the barricade the inmates had constructed at the cellblock entrance. A second group of officers, without firearms, would be behind them. Whitley ordered Kennicott to fire a warning shot as he crossed the barricade. He also ordered Kennicott to shoot low at any prisoners climbing the stairs toward cell 201, since they could pose a threat to the safety of the hostage or to Whitley himself, who would be climbing the stairs in an attempt to free the hostage in cell 201.

At about 10:30 p.m., Whitley reappeared just outside the barricade. By this time, about a half hour had elapsed since the earlier breaking of furniture, and the noise level in the cellblock had noticeably diminished. Respondent, who was standing at the bottom of the stairway, asked about the key. Whitley replied "No," clambered over the barricade, yelled "shoot the bastards," and ran toward the stairs after Klenk, who had been standing in the open areaway along with a number of other inmates. Kennicott fired a warning shot into the wall opposite the cellblock entrance as he followed Whitley over the barricade. He then fired a second shot that struck a post near the stairway. Meanwhile, Whitley chased Klenk up the stairs, and shortly thereafter respondent started up the stairs. Kennicott fired a third shot that struck respondent in the left knee. Another inmate was shot on the stairs and several others on the lower tier were wounded by gunshot. The inmates in cell 201 prevented Klenk from entering, and Whitley subdued Klenk at the cell door, freeing the hostage.

As a result of the incident, respondent sustained severe damage to his left leg and mental and emotional distress. He subsequently commenced this action pursuant to 42 U. S. C. § 1983, alleging that petitioners deprived him of his rights under the Eighth and Fourteenth Amendments and raising pendent state law claims for assault and battery and negligence. Many of the facts were stipulated, see Tr. 53–60, but both sides also presented testimony from witnesses to the disturbance and the rescue attempt, as well as from expert witnesses with backgrounds in prison discipline and security. At the conclusion of trial, the District Judge directed a verdict for petitioners. He understood respondent's claim to be based solely on the Eighth Amendment as made applicable to the States by the Fourteenth Amendment. See *Robinson* v. *California*, 370 U. S. 660 (1962). The District Judge held:

> "[D]efendants' use of deadly force was justified under the unique circumstances of this case. Possible alternatives were considered and reasonably rejected by prison officers. The use of shotguns and specifically the order to shoot low anyone following the unarmed Whitley up the stairs were necessary to protect Whitley, secure the safe release of the hostage and to restore order and discipline. Even in hindsight, it cannot be said that defendants' actions were not reasonably necessary." 546 F. Supp. 726, 735 (Ore. 1982).

In the alternative, he held that petitioners were immune from damages liability because the constitutional constraints on the use of force in a prison riot were not clearly established. Finally, the District Judge held that respondent was barred from recovery on his pendent state law claims by virtue of an immunity conferred on public officers by the Oregon Tort Claims Act as to claims arising out of riots or mob actions.

A panel of the Court of Appeals for the Ninth Circuit reversed in part and affirmed in part, with one judge dissenting.

743 F. 2d 1372 (1984). The court held that an Eighth Amendment violation would be established "if a prison official deliberately shot Albers under circumstances where the official, with due allowance for the exigency, knew or should have known that it was unnecessary," *id.*, at 1375, or "if the emergency plan was adopted or carried out with 'deliberate indifference' to the right of Albers to be free of cruel unusual punishment." *Ibid.* The Court of Appeals pointed to evidence that the general disturbance in cellblock "A" was subsiding and to respondent's experts' testimony that the use of deadly force was excessive under the circumstances and should have been preceded by a verbal warning, and concluded that the jury could have found an Eighth Amendment violation. *Id.*, at 1376.

The Court of Appeals also ruled that petitioners could not prevail on their qualified immunity defense, because "[a] finding of deliberate indifference is inconsistent with a finding of good faith or qualified immunity." *Ibid.* Accordingly, the court remanded for a new trial on respondent's Eighth Amendment claim, while agreeing with the District Judge that respondent could not prevail on his state law claims, *id.*, at 1377, and that he had not asserted an independent violation of the Fourteenth Amendment. *Id.*, at 1374, n. 1. We granted certiorari, 472 U. S. 1007 (1985), and now reverse.

## II

The language of the Eighth Amendment, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted," manifests "an intention to limit the power of those entrusted with the criminal-law function of government." *Ingraham* v. *Wright*, 430 U. S. 651, 664 (1977). The Cruel and Unusual Punishments Clause "was designed to protect those convicted of crimes," *ibid.*, and consequently the Clause applies "only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." *Id.*, at 671, n. 40.

See also *Revere* v. *Massachusetts General Hospital*, 463
U. S. 239, 244 (1983); *Bell* v. *Wolfish*, 441 U. S. 520, 535,
n. 16 (1979). An express intent to inflict unnecessary pain is
not required, *Estelle* v. *Gamble*, 429 U. S. 97, 104 (1976)
("deliberate indifference" to a prisoner's serious medical
needs is cruel and unusual punishment), and harsh "condi-
tions of confinement" may constitute cruel and unusual pun-
ishment unless such conditions "are part of the penalty that
criminal offenders pay for their offenses against society."
*Rhodes* v. *Chapman*, 452 U. S. 337, 347 (1981).

Not every governmental action affecting the interests or
well-being of a prisoner is subject to Eighth Amendment
scrutiny, however. "After incarceration, only the '"unnec-
essary and wanton infliction of pain"' . . . constitutes cruel
and unusual punishment forbidden by the Eighth Amend-
ment." *Ingraham* v. *Wright, supra*, at 670 (quoting *Estelle*
v. *Gamble, supra*, at 103) (citations omitted). To be cruel
and unusual punishment, conduct that does not purport to be
punishment at all must involve more than ordinary lack of
due care for the prisoner's interests or safety. This reading
of the Clause underlies our decision in *Estelle* v. *Gamble,
supra*, at 105–106, which held that a prison physician's "negli-
gen[ce] in diagnosing or treating a medical condition" did not
suffice to make out a claim of cruel and unusual punishment.
It is obduracy and wantonness, not inadvertence or error
in good faith, that characterize the conduct prohibited by
the Cruel and Unusual Punishments Clause, whether that
conduct occurs in connection with establishing conditions of
confinement, supplying medical needs, or restoring official
control over a tumultuous cellblock. The infliction of pain in
the course of a prison security measure, therefore, does not
amount to cruel and unusual punishment simply because it
may appear in retrospect that the degree of force authorized
or applied for security purposes was unreasonable, and hence
unnecessary in the strict sense.

The general requirement that an Eighth Amendment claimant allege and prove the unnecessary and wanton infliction of pain should also be applied with due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged. The deliberate indifference standard articulated in *Estelle* was appropriate in the context presented in that case because the State's responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities. Consequently, "deliberate indifference to a prisoner's serious illness or injury," *Estelle, supra,* at 105, can typically be established or disproved without the necessity of balancing competing institutional concerns for the safety of prison staff or other inmates. But, in making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and prison officials alike, in addition to the possible harms to inmates against whom force might be used. As we said in *Hudson* v. *Palmer,* 468 U. S. 517, 526–527 (1984), prison administrators are charged with the responsibility of ensuring the safety of the prison staff, administrative personnel, and visitors, as well as the "obligation to take reasonable measures to guarantee the safety of the inmates themselves." In this setting, a deliberate indifference standard does not adequately capture the importance of such competing obligations, or convey the appropriate hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance.

Where a prison security measure is undertaken to resolve a disturbance, such as occurred in this case, that indisputably poses significant risks to the safety of inmates and prison staff, we think the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically

for the very purpose of causing harm." *Johnson* v. *Glick*, 481 F. 2d 1028, 1033 (CA2) (Friendly, J.), cert. denied *sub nom. John* v. *Johnson*, 414 U. S. 1033 (1973). As the District Judge correctly perceived, "such factors as the need for the application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted," 481 F. 2d, at 1033, are relevant to that ultimate determination. See 546 F. Supp., at 733. From such considerations inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur. See *Duckworth* v. *Franzen*, 780 F. 2d 645, 652 (CA7 1985) (equating "deliberate indifference," in an Eighth Amendment case involving security risks, with "recklessness in criminal law," which "implies an act so dangerous that the defendant's knowledge of the risk can be inferred"); cf. *Block* v. *Rutherford*, 468 U. S. 576, 584 (1984) (requiring pretrial detainees claiming that they were subjected to "punishment" without due process to prove intent to punish or show that the challenged conduct " 'is not reasonably related to a legitimate goal,' " from which an intent to punish may be inferred); *Bell* v. *Wolfish, supra,* at 539. But equally relevant are such factors as the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response.

When the "ever-present potential for violent confrontation and conflagration," *Jones* v. *North Carolina Prisoners' Labor Union, Inc.,* 433 U. S. 119, 132 (1977), ripens into *actual* unrest and conflict, the admonition that "a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators," *Rhodes* v. *Chapman, supra,* at 349, n. 14, carries special weight. "Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their

judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell* v. *Wolfish*, 441 U. S., at 547. That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline. It does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice. Accordingly, in ruling on a motion for a directed verdict in a case such as this, courts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives. Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard we have described, the case should not go to the jury.

III

Since this case comes to us from a decision of the Court of Appeals reversing the District Court's directed verdict for petitioners, we evaluate the facts in the light most favorable to respondent. The Court of Appeals believed that testimony that the disturbance was subsiding at the time the assault was made, and the conflicting expert testimony as to whether the force used was excessive, were enough to allow a jury to find that respondent's Eighth Amendment rights were violated. We think the Court of Appeals effectively collapsed the distinction between mere negligence and wanton conduct that we find implicit in the Eighth Amendment. Only if ordinary errors of judgment could make out an Eighth Amendment claim would this evidence create a jury question.

To begin with, although the evidence could be taken to show that the general disturbance had quieted down, a guard was still held hostage, Klenk was armed and threatening,

several other inmates were armed with homemade clubs, numerous inmates remained outside their cells, and the cellblock remained in the control of the inmates. The situation remained dangerous and volatile. As respondent concedes, at the time he was shot "an officer's safety was in question and . . . an inmate was armed and dangerous." Brief for Respondent 25. Prison officials had no way of knowing what direction matters would take if they continued to negotiate or did nothing, but they had ample reason to believe that these options presented unacceptable risks.

Respondent's expert testimony is likewise unavailing. One of respondent's experts opined that petitioners gave inadequate consideration to less forceful means of intervention, and that the use of deadly force under the circumstances was not necessary to "prevent imminent danger" to the hostage guard or other inmates. Tr. 266. Respondent's second expert testified that prison officials were "possibly a little hasty in using the firepower" on the inmates. *Id.*, at 314. At most, this evidence, which was controverted by petitioners' experts, establishes that prison officials arguably erred in judgment when they decided on a plan that employed potentially deadly force. It falls far short of a showing that there was no plausible basis for the officials' belief that this degree of force was necessary. Indeed, any such conclusion would run counter to common sense, in light of the risks to the life of the hostage and the safety of inmates that demonstrably persisted notwithstanding repeated attempts to defuse the situation. An expert's after-the-fact opinion that danger was not "imminent" in no way establishes that there was no danger, or that a conclusion by the officers that it *was* imminent would have been wholly unreasonable.

Once the basic design of the plan was in place, moreover, it is apparent why any inmate running up the stairs after Captain Whitley, or interfering with his progress towards the hostage, could reasonably be thought to present a threat to the success of the rescue attempt and to Whitley—particu-

larly after a warning shot was fired. A sizable group of inmates, in defiance of the cell-in order and in apparent support of Klenk, continued to stand in the open area on the lower tier. Respondent testified that this was not "an organized group," *id.*, at 113, and that he saw no inmates armed with clubs in that area. *Id.*, at 114. But the fact remains that the officials had no way of knowing which members of that group of inmates had joined with Klenk in destroying furniture, breaking glass, seizing the hostage, and setting up the barricade, and they certainly had reason to believe that some members of this group might intervene in support of Klenk. It was perhaps also foreseeable that one or more of these inmates would run up the stairs after the shooting started in order to return to their cells. But there would be neither means nor time to inquire into the reasons why each inmate acted as he did. Consequently, the order to shoot, qualified as it was by an instruction to shoot low, falls short of commanding the infliction of pain in a wanton and unnecessary fashion.

As petitioners' own experts conceded, a verbal warning would have been desirable, in addition to a warning shot, if circumstances permitted it to be given without undue risk. See *id.*, at 446, 556. While a jury might conclude that this omission was unreasonable, we think that an inference of wantonness could not properly be drawn. First, some warning was given in the form of the first shot fired by Officer Kennicott. Second, the prison officials could have believed in good faith that such a warning might endanger the success of the security measure because of the risk that it would have allowed one or more inmates to climb the stairs before they could be stopped. The failure to provide for verbal warnings is thus not so insupportable as to be wanton. Accordingly, a jury could not properly find that this omission, coupled with the order to shoot, offended the Eighth Amendment.

To be sure, the plan was not adapted to take into account the appearance of respondent on the scene, and, on the facts

as we must take them, Whitley was aware that respondent was present on the first tier for benign reasons. Conceivably, Whitley could have added a proviso exempting respondent from his order to shoot any prisoner climbing the stairs. But such an oversight simply does not rise to the level of an Eighth Amendment violation. Officials cannot realistically be expected to consider every contingency or minimize every risk, and it was far from inevitable that respondent would react as he did. Whitley was about to risk his life in an effort to rescue the hostage, and he was understandably focusing on the orders essential to the success of the plan. His failure to make special provision for respondent may have been unfortunate, but is hardly behavior from which a wanton willingness to inflict unjustified suffering on respondent can be inferred.

Once it is established that the order to shoot low at anyone climbing the stairs after a warning shot was not wanton, respondent's burden in showing that the actual shooting constituted the wanton and unnecessary infliction of pain is an extremely heavy one. Accepting that respondent could not have sought safety in a cell on the lower tier, the fact remains that had respondent thrown himself to the floor he would not have been shot at. Instead, after the warning shot was fired, he attempted to return to his cell by running up the stairs behind Whitley. That is equivocal conduct. While respondent had not been actively involved in the riot and indeed had attempted to help matters, there is no indication that Officer Kennicott knew this, nor any claim that he acted vindictively or in retaliation. Respondent testified that as he started to run up the stairs he "froze" when he looked to his left and saw Kennicott, and that "we locked eyes." *Id.*, at 119. Kennicott testified that he saw several inmates running up the stairs, that he thought they were pursuing Whitley, and that he fired at their legs. *Id.*, at 459. To the extent that this testimony is conflicting, we resolve the conflict in respondent's favor by assuming that Kennicott shot at re-

spondent rather than at the inmates as a group. But this does not establish that Kennicott shot respondent knowing it was unnecessary to do so. Kennicott had some basis for believing that respondent constituted a threat to the hostage and to Whitley, and had at most a few seconds in which to react. He was also under orders to respond to such a perceived threat in precisely the manner he did. Under these circumstances, the actual shooting was part and parcel of a good-faith effort to restore prison security. As such, it did not violate respondent's Eighth Amendment right to be free from cruel and unusual punishments.

## IV

As an alternative ground for affirmance, respondent contends that, independently of the Eighth Amendment, the shooting deprived him of a protected liberty interest without due process of law, in violation of the Fourteenth Amendment. Respondent correctly observes that any ground properly raised below may be urged as a basis for affirmance of the Court of Appeals' decision, see *United States* v. *New York Telephone Co.*, 434 U. S. 159, 166, n. 8 (1977), and argues that he has maintained throughout this litigation that his "constitutional protection against the use of excessive and unnecessary force, as well as the use of deadly force without meaningful warning," derives from the Due Process Clause as well as the Eighth Amendment. Brief for Respondent 25, n. 13.

The District Court was correct in ruling that respondent did not assert a *procedural* due process claim that the State was obliged to afford him some kind of hearing either before or after he was shot. See 546 F. Supp., at 732, n. 1. But we believe respondent did raise a claim that his "substantive rights under the Due Process Clause of the Fourteenth Amendment," *Youngberg* v. *Romeo*, 457 U. S. 307, 309 (1982), were infringed by prison officials when he was shot. His complaint alleged violations of the Eighth and Four-

teenth Amendments, App. 2, 7 (First Amended Complaint), and at argument on petitioners' motion for a directed verdict, counsel for both petitioners and respondents treated the Fourteenth Amendment as a distinct though overlapping source of substantive protection from state action involving excessive force. See *id.*, at 21, 27. Accordingly, we consider whether the Due Process Clause could serve as an alternative basis for affirmance.

We need say little on this score. We think the Eighth Amendment, which is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners in cases such as this one, where the deliberate use of force is challenged as excessive and unjustified. It would indeed be surprising if, in the context of forceful prison security measures, "conduct that shocks the conscience" or "afford[s] brutality the cloak of law," and so violates the Fourteenth Amendment, *Rochin* v. *California,* 342 U. S. 165, 172, 173 (1952), were not also punishment "inconsistent with contemporary standards of decency" and "'repugnant to the conscience of mankind,'" *Estelle* v. *Gamble,* 429 U. S., at 103, 106, in violation of the Eighth. We only recently reserved the general question "whether something less than intentional conduct, such as recklessness or 'gross negligence,' is enough to trigger the protections of the Due Process Clause." *Daniels* v. *Williams,* 474 U. S. 327, 334, n. 3 (1986). Because this case involves prison inmates rather than pretrial detainees or persons enjoying unrestricted liberty we imply nothing as to the proper answer to that question outside the prison security context by holding, as we do, that in these circumstances the Due Process Clause affords respondent no greater protection than does the Cruel and Unusual Punishments Clause.

Petitioners also ask us to hold that the Court of Appeals erred in ruling that they did not enjoy qualified immunity. We decline to review that holding, because our decision that

petitioners were entitled to a directed verdict on the merits makes it unnecessary to do so.

The judgment of the Court of Appeals is

*Reversed.*

JUSTICE MARSHALL, with whom JUSTICE BRENNAN, JUSTICE BLACKMUN, and JUSTICE STEVENS join, dissenting.

I share the majority's concern that prison officials be permitted to respond reasonably to inmate disturbances without unwarranted fear of liability. I agree that the threshold for establishing a constitutional violation under these circumstances is high. I do not agree, however, that the contested existence of a "riot" in the prison lessens the constraints imposed on prison authorities by the Eighth Amendment.

The majority has erred, I believe, both in developing its legal analysis and in employing it. First, the especially onerous standard the Court has devised for determining whether a prisoner injured during a prison disturbance has been subjected to cruel and unusual punishment is incorrect and not justified by precedent. That standard is particularly inappropriate because courts deciding whether to apply it must resolve a preliminary issue of fact that will often be disputed and properly left to the jury. Finally, the Court has applied its test improperly to the facts of this case. For these reasons, I must respectfully dissent.

I

The Court properly begins by acknowledging that, for a prisoner attempting to prove a violation of the Eighth Amendment, "[a]n express intent to inflict unnecessary pain is not required, *Estelle* v. *Gamble*, 429 U. S. 97, 104 (1976)." *Ante,* at 319. Rather, our cases have established that the "unnecessary and wanton" infliction of pain on prisoners constitutes cruel and unusual punishment prohibited by the Eighth Amendment, even in the absence of intent to harm. *Ibid.;* see also *Ingraham* v. *Wright*, 430 U. S. 651, 670 (1977); *Gregg* v. *Georgia*, 428 U. S. 153, 173 (1976) (joint opinion of

Stewart, POWELL, and STEVENS, JJ.). Having correctly articulated the teaching of our cases on this issue, however, the majority inexplicably arrives at the conclusion that a constitutional violation in the context of a prison uprising can be established only if force was used "maliciously and sadistically for the very purpose of causing harm," *ante*, at 320–321—thus requiring the very "express intent to inflict unnecessary pain" that it had properly disavowed.[1]

The Court imposes its heightened version of the "unnecessary and wanton" standard only when the injury occurred in the course of a "disturbance" that "poses significant risks," *ante*, at 320. But those very questions—whether a disturbance existed and whether it posed a risk—are likely to be hotly contested. It is inappropriate, to say the least, to condition the choice of a legal standard, the purpose of which is to determine whether to send a constitutional claim to the jury, upon the court's resolution of factual disputes that in many cases should themselves be resolved by the jury.

The correct standard for identifying a violation of the Eighth Amendment under our cases is clearly the "unnecessary and wanton" standard, which establishes a high hurdle to be overcome by a prisoner seeking relief for a constitutional violation. The full circumstances of the plaintiff's injury, including whether it was inflicted during an attempt to quell a riot and whether there was a reasonable apprehension of danger, should be considered by the factfinder in determining whether that standard is satisfied in a particular case. There is simply no justification for creating a distinct and more onerous burden for the plaintiff to meet merely because

---

[1] This intent standard ostensibly derives from an opinion of Judge Friendly in *Johnson* v. *Glick*, 481 F. 2d 1028, 1033 (CA2), cert. denied *sub nom. John* v. *Johnson*, 414 U. S. 1033 (1973). That opinion, however, considered maliciousness not as a prerequisite to a constitutional violation, but rather as a factor that, if present, could enable a plaintiff to survive a motion to dismiss when otherwise the facts might be insufficient to make out a claim. 481 F. 2d, at 1033.

the judge believes that the injury at issue was caused during a disturbance that "pose[d] significant risks to the safety of inmates and prison staff," *ante*, at 320. Determination of whether there was such a disturbance or risk, when disputed, should be made by the jury when it resolves disputed facts, not by the court in its role as arbiter of law. See *Byrd* v. *Blue Ridge Cooperative*, 356 U. S. 525, 537 (1958).

## II

The Court properly begins its application of the law by reciting the principle that the facts must be viewed in the light most favorable to respondent, who won a reversal of a directed verdict below. See *Galloway* v. *United States*, 319 U. S. 372, 395 (1943). If, under any reasonable interpretation of the facts, a jury could have found the "unnecessary and wanton" standard to be met, then the directed verdict was improper. The majority opinion, however, resolves factual disputes in the record in petitioners' favor and discounts much of respondent's theory of the case. This it is not entitled to do.

The majority pays short shrift to respondent's significant contention that the disturbance had quieted down by the time the lethal force was employed. *Ante*, at 322–323. Respondent presented substantial testimony to show that the disturbance had subsided, Tr. 112, 165, 188, 193; that only one prisoner, Klenk, remained in any way disruptive, *id.*, at 212; and that even Klenk had calmed down enough at that point to admit that he had " 'gone too far.' " *Id.*, at 117. The majority asserts that "a guard was still held hostage, Klenk was armed and threatening, several other inmates were armed with homemade clubs, numerous inmates remained outside their cells, and . . . [t]he situation remained dangerous and volatile." *Ante*, at 322–323. Respondent's evidence, however, indicated that the guard was not, in fact, in danger. He had been put into a cell by several inmates to prevent Klenk from harming him. Tr. 161. Captain Whitley had

been to see the guard, and had observed that the inmates protecting him from Klenk were not armed and had promised to keep Klenk out. *Id.*, at 58 (stipulation), 163. According to respondent's evidence, moreover, no other inmates were assisting Klenk in any way when the riot squad was called in; they were simply "milling around," waiting for Klenk to be taken into custody, or for orders to return to their cells. *Id.*, at 188. Respondent's evidence tended to show not that the "situation remained dangerous and volatile," *ante*, at 323, but, on the contrary, that it was calm. Although the Court sees fit to emphasize repeatedly "the risks to the life of the hostage and the safety of inmates that demonstrably persisted notwithstanding repeated attempts to defuse the situation," *ibid.*, I can only point out that respondent bitterly disputed that any such risk to guards or inmates had persisted. The Court just does not believe his story.

The Court's treatment of the expert testimony is equally insensitive to its obligation to resolve all disputes in favor of respondent. Respondent's experts testified that the use of deadly force under these circumstances was not justified by any necessity to prevent imminent danger to the officers or the inmates, Tr. 266; that the force used was excessive, *ibid.*; and that even if deadly force had been justified, it would have been unreasonable to unleash such force without a clear warning to allow nonparticipating inmates to return to their cells. *Id.*, at 269. Insofar as expert testimony can ever be useful to show that prison authorities engaged in the "unnecessary and wanton" infliction of pain, even though it will always amount to "after-the-fact opinion" regarding the circumstances of the injury, see *ante*, at 323, respondent's expert evidence contributed to the creation of a factual issue.

The majority characterizes the petitioners' error in using deadly force where it was not justified as an "oversight." *Ante*, at 325. This is an endorsement of petitioners' rendition of the facts. As portrayed by respondent's evidence, the "error" was made in cold blood. Respondent's involve-

ment started when, at the request of one of the inmates, he approached petitioner Whitley, who was talking to Klenk, to ask if Whitley would supply a key to a gate so that the elderly and sick patients in so-called "medical cells" near the area of disturbance could be removed before any tear gas was used. Tr. 115–116. Captain Whitley said that he would go and get the key, and left the cellblock. *Ibid.* In two or three minutes, Whitley returned. *Id.*, at 118. Respondent went to the door of the cellblock, and asked Whitley if he had brought the key. Whitley responded "'No,'" turned his head back and yelled: "'Let's go, let's go. Shoot the bastards!'" *Ibid.*

Respondent, afraid, ran from his position by the door and headed for the stairs, the only route back to his cell. *Id.*, at 118–119. He caught some movement out of the corner of his eye, looked in its direction, and saw petitioner Kennicott. According to respondent: "'I froze. I looked at him; we locked eyes, then I looked down and seen the shotgun in his hand, then I seen the flash, and the next thing I know I was sitting down, grabbing my leg.'" *Id.*, at 119. Losing a great deal of blood, respondent crawled up the stairs and fell on his face, trying to get out of range of the shotguns. *Ibid.* After about 10 minutes, an officer grabbed respondent by the hair and dragged him downstairs. *Id.*, at 194. As he lay there, another officer came and stood over respondent and shoved the barrel of a gun or gas pistol into respondent's face. *Id.*, at 122. Respondent was left lying and bleeding profusely for approximately 10 or 15 more minutes, and was then taken to the prison hospital. *Id.*, at 194. He suffered very severe injury. Meanwhile, Klenk had been subdued with no resistance by Whitley, *id.*, at 164, 234, who was unarmed, *id.*, at 233.

Other testimony showed that, although most of the inmates assembled in the area were clearly not participating in the misconduct, they received no warning, instructions, or opportunity to leave the area and return to their cells before the officers started shooting. *Id.*, at 163. Neither respond-

ent nor any other inmate attempted to impede the officers as they entered the cellblock. *Id.*, at 234. The officers were described as "wild," "agitated, excited," not in full control of their emotions. *Id.*, at 192. One officer, prior to entering cellblock "A," told the others to "'shoot their asses off, and if Klenk gets in the way, kill him.'" *Ibid.* At the time of this assault, the cellblock was described as "quiet." *Id.*, at 193.

If a jury credited respondent's testimony and that of his witnesses, it would have believed that there was only one inmate who was temporarily out of control, Klenk—"scared," *id.*, at 165, and "high," *id.*, at 117—and ready to give up. The disturbance in the block had lasted only 15 or 20 minutes when it subsided, and there appeared to be no lasting danger to anyone. Respondent was shot while he stood motionless on the stairs, and was left to bleed for a perilously long time before receiving any assistance.

## III

Part III of the Court's opinion falls far short of a rendition of the events in the light most favorable to respondent. In that light, the facts present a very close question as to whether the prison officials' infliction of pain on respondent could be said to display the level of wantonness necessary to make out a constitutional violation. At the very least, it is clear that fair-minded people could differ on the response to that question, and that is all it takes to preclude a directed verdict.

The majority suggests that the existence of more appropriate alternative measures for controlling prison disturbances is irrelevant to the constitutional inquiry, but surely it cannot mean what it appears to say. For if prison officials were to drop a bomb on a cellblock in order to halt a fistfight between two inmates, for example, I feel confident that the Court would have difficulty concluding, as a matter of law, that such an action was not sufficiently wanton to present a jury question, even though concededly taken in an effort to re-

store order in the prison. Thus, the question of wantonness in the context of prison disorder, as with other claims of mistreatment under the Eighth Amendment, is a matter of degree. And it is precisely in cases like this one, when shading the facts one way or the other can result in different legal conclusions, that a jury should be permitted to do its job. Properly instructed, a jury would take into account the petitioners' legitimate need to protect security, the extent of the danger presented, and the reasonableness of force used, in assessing liability. Moreover, the jury would know that a prisoner's burden is a heavy one, if he is to establish an Eighth Amendment violation under these circumstances.[2] Whether respondent was able to meet that burden here is a question for the jury. From the Court's usurpation of the jury's function, I dissent. I would affirm the judgment of the Court of Appeals.

---

[2] The majority also rejects the pure Fourteenth Amendment due process claim asserted by respondent before the District Court. For the reasons stated in JUSTICE BLACKMUN's dissent in *Davidson* v. *Cannon*, 474 U. S. 344, 349 (1986), which I joined, I believe that the evidence precluding a directed verdict under the "unnecessary and wanton" standard also precludes a directed verdict on respondent's due process claim. JUSTICE STEVENS does not join this footnote.