PRISCILLA R. OWEN, Circuit Judge,
dissenting.
I respectfully dissent because there is absolutely no evidence that Dr. Sabater was negligent in her diagnosis and treatment of Michael Bias, much less evidence that Sabater was deliberately indifferent to a substantial risk of serious harm to Bias.[1] This is not a case in which we are evaluating a plaintiffs Complaint to see if it withstands a motion to dismiss. There has been a trial on the merits, and the district court found Sabater liable based on the testimony of Bias, who is a layman, and a 20-minute videotape, from which the district court concluded that Bias’s condition “immediately prior to his transport out of the Allred Unit, was open and obvious.” There was no expert testimony or expert opinion that Bias’s condition was such that a reasonable health-care provider would have recognized that transporting Bias in a van to a psychiatric unit in another prison facility presented a risk of serious harm.
I do not take the position that expert testimony is required in every case in *166 which it is alleged that a physician was deliberately indifferent to a patient’s condition. But here, Dr. Sabater examined Bias and monitored him. At least two other health-care professionals were present during that assessment and monitoring. Sabater may have misdiagnosed Bias’s condition, although there is no evidence that she did or that if she did, it amounted even to negligence. But misdiagnosis is not withholding treatment nor is it treatment that is consciously indifferent to a substantial risk of serious harm. Whether it would have been obvious to a reasonable physician that transporting Bias to another unit in a van presented a substantial risk of serious harm requires an expert’s analysis. Bias, a layman and the only witness he called at trial, cannot provide that analysis, nor can federal judges, learned though they may be. The record in this case simply does not support a finding of deliberate indifference.
The district court’s opinion reflects that Dr. Sabater’s liability was predicated on three conclusions. The first was, “[t]he Court finds that a reasonable person would have known that her conduct in ordering the transportation of an inmate in Bias’ condition to a prison unit 150 miles away, rather than providing immediate medical attention, would cause a significant delay, if not a complete denial, of medical care.” The record is devoid of any evidence that Bias required immediate medical attention or that transporting him 150 miles would subject him to a substantial risk of injury. Only a health care expert could make such an assessment in this case, and there was no expert testimony or opinion from any source that was critical of Dr. Sabater’s care of Bias.
The facts are essentially undisputed. Bias attempted suicide sometime during the evening of May 20 by slicing his wrist and ingesting prescription drugs he had surreptitiously saved over a period of almost a month. The district court did not find that Sabater had any responsibility for Bias’s possession or ingestion of those drugs. Nor was Sabater on duty or present at the prison on May 20 when the suicide attempt occurred. Other medical personnel attended Bias after his attempt to take his own life, and when asked if he had taken any medication, he repeatedly replied that he had only taken what Saba-ter had prescribed and in the amounts prescribed. Bias’s drug ingestion was not known to any prison official or attendee, including Dr. Sabater, until long after Bias had left the Allred facility.
Sabater saw Bias at approximately noon on the day after his suicide attempt. She examined him, concluded that he remained clinically depressed, and requested TDCJ to transfer Bias by its next available transport to the Montford Unit, where TDCJ’s psychiatric unit was located.
The TDCJ van did not arrive until about 7:30 the next morning, May 22. Prison officials ordered Bias from his cell, but he did not respond. A use-of-force team was called to remove Bias from his cell, and the team recorded the events on videotape. The video shows Bias lying on his back, without clothing, on a “suicide blanket.” The guards on the team ordered Bias to “wake up” and “open [his] eyes.” Bias responded by raising his head and tilting it slightly. The guards used an ammonia inhalant, to which Bias responded with a groan and slight movement. The remainder of the video reflects that Bias appeared motionless and limp as the guards dressed him, handcuffed him, and laid him on a gurney. At least twice during the video, Dr. Sabater and a nurse appeared and took Bias’s vital signs, which were normal. Dr. Sabater flashed a light in Bias’s eyes and reported normal reactivity. Dr. Sabater testified at trial that based on *167 those diagnostics and observations she concluded her original diagnosis of clinical depression explained Bias’s physical condition. The videotape concludes with guards placing Bias in the TDCJ van on his back in a confined space.
Josie Grubbs, a nurse present during the transfer, told Allred investigators that “in hindsight a drug screen may have been [of] some assistance in determining Offender Bias’s condition,” but that she had no reason to believe that an overdose caused his condition. Curtis Cooper, an associate clinical psychologist also present, told the investigators that Bias was unresponsive to the ammonia inhalant and speculated his condition was due to “waxy flexibility,” which he described as the brain and body working asynchronously. Cooper further stated that “although Dr. Sa-bater could have requested an opinion of another physician,” that was not in her nature. Nonetheless, Cooper stated “Offender Bias’s vital signs were within acceptable range and there was no other indicator present” to suggest an overdose.
This uncontradicted evidence does not support a finding of deliberate indifference. Bias’s complaint at trial that Saba-ter should have done more does not raise a fact question, and the Supreme Court has held that such a complaint fails to demonstrate deliberate indifference.[2]
The district court seems to have based its finding of deliberate indifference largely, if not entirely, on the videotape. The second conclusion in the district court’s opinion is that “the Court finds that plaintiffs condition on May 22, 1997 was an exceptional circumstance obviously requiring immediate medical attention. A review of the videotape along with the testimony presented at trial confirms this finding.” However, the three health-care professionals who attended Bias while he was being prepared to be taken to the Montford Unit actually examined Bias. His eyes and pupils were examined. His vital signs were checked, more than once, and they were normal. None of the three attending professionals thought at the time that transporting Bias to the Mont-ford Unit would place him at risk. All of this is undisputed. A layperson cannot independently draw the conclusion that Bias was at risk just because, in hindsight, it is now known that Bias was injured during the transportation.
The trip to the Robinson Unit lasted approximately three hours. Apparently, had the transport van gone directly to the Montford Unit, the travel time would have been about forty-five minutes longer. The district court deduced that Bias’s limp condition when he was placed in the van made a substantial risk of serious harm obvious. But how does a limp condition allow a layman to conclude that travel in the back of a van for three hours creates such a risk? It is not intuitively or otherwise obvious that lying in a prone, immobile position for three hours presents a risk. Common experience suggests otherwise. There is simply nothing in the record that permits the inferences the district court drew.
The third conclusion in the district court’s opinion is similar to the others: “The Court finds that the plaintiffs condition on May 22, 1997, immediately prior to his transport out of the Allred Unit, was open and obvious, that Dr. Sabater was aware of facts from which an inference could be drawn that a substantial risk of serious harm existed, that she actually drew that inference and that her intentional failure to act caused a prolonged delay in medical care and resulted in substantial *168 injury to Michael Bias.” Here again, the nature of Bias’s condition and the risks that transporting him posed were not matters about which a layperson has knowledge. If Dr. Sabater had entirely turned her back on Bias and refused to undertake any examination or treatment, this might well be a different case. But she did not. She ordered that he be sent to another facility for care, she continued to examine him, she monitored him, and other health care professionals assisted her. Her professional judgment may have been faulty, but there is no basis for concluding she was deliberately indifferent.
The term “deliberate indifference” is not self-defining,[3] but the Supreme Court frequently defines it in relation to negligence and, in eases such as this, medical malpractice.[4] The Court notes deliberate indifference “describes a state of mind more blameworthy than negligence.”[5] Eighth Amendment liability for deliberate indifference requires “ ‘more than ordinary lack of due care for the prisoner’s interests or safety’ ” — i.e., more than medical malpractice.[6] In cases involving medical treatment, a prisoner’s complaint that a physician was merely negligent in diagnosing or treating the prisoner fails to state a claim under the Eighth Amendment.[7] “Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.”[8] The facts in this case present “a classic example of a matter for medical judgment.”[9] “A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice.” [10] Sabater made the medical decision to transfer Bias to the psychiatric unit at another prison. Without evidence of the standard of care that obtained, a court cannot determine that Sabater deviated from that standard, much less that she acted with deliberate indifference in treating and evaluating Bias. Establishing the standard of care requires specialized knowledge and training. Lay fact-finders cannot determine from their own observations whether a physician’s course of conduct was proper.
The concurring opinion concludes that Bias’s “obvious and emergent condition” distinguishes this case from Estelle. What may be “obvious and emergent” to a layman is a different question from what is obvious and emergent to a physician. Medical personnel routinely encounter patients whose prognosis looks extremely grave to the lay observer, but physicians using medical diagnostics would draw a very different conclusion. Laymen cannot judge whether transportation of a patient in Bias’s condition posed a substantial risk of serious harm.
The concurring opinion cites this court’s decision in Gobert v. Caldwell[11] for the proposition that “expert testimony cannot create a question of fact as to what [the doctor] knew,” then reasons that Bias established the subjective knowledge prong of deliberate indifference because the fact-finder could “infer ... subjective knowl *169 edge” from “the obviousness of [Bias’s] condition and its risks.” [12] Our decision in Gobert not only fails to support this conclusion, Gobert requires that we reverse and render judgment for Sabater in this case.
We correctly recognized in Gobert that an inmate “must first prove objective exposure to a substantial risk of serious harm”[13] and that “the decision whether to provide additional treatment is a classic example of a matter for medical judgment.” [14] We do not reach the subjective knowledge element unless and until there is evidence of exposure to a substantial risk of serious harm. There is no such evidence in this case. It cannot be “inferred” by laymen. The footnote in Gobert on which the concurring opinion relies recognizes this.[15] However, the presence of a substantial health risk was not at issue in that case because the defendant physician acknowledged that he knew that developing a serious infection in the inmate’s leg was a “concern.” [16] Gobert’s leg had been crushed below the knee when the garbage truck on which he was riding as a “ ‘hopper’ ” collided with another vehicle, and he had surgery that included the placement of pins in his leg.[17] Gobert was continuously on antibiotics for more than two months, except for seven days at issue in the case, his wound frequently exuded puss and blood, including areas around the pins, and there was swelling and redness on occasion. The court therefore concluded in GobeH that the nature of the inmate’s “wound itself posed a substantial health risk.”[18] Within days of his release from prison, Gobert was diagnosed with a very serious infection of the bone in his injured leg.[19] The court nevertheless held, as a matter of law on summary judgment, that the “extremely high standard”[20] of deliberate indifference had not been met[21] in spite of the district court’s conclusion that numerous fact issues existed regarding deliberate indifference, including “whether [the physician] looked at the medical records” and “whether or not other actions should have been taken.”[22]
*170 The Eleventh Circuit’s decision in Campbell v. Sikes[23] cited in GobeH, noted that “[pjroof that the defendant should have perceived the risk, but did not, is insufficient” to prove deliberate indifference.[24] In this case, we have no reliable evidence that there was a substantial risk, much less that Sabater should have perceived or actually recognized a substantial risk to Bias such as necrosis from being transported in a van.
The concurring opinion concludes that “the fact that when Bias finally arrived at the Hendricks Medical Center and received proper treatment, he was immediately diagnosed as suffering from a drug overdose, as well as necrosis and other physical injuries he did not have when Dr. Sabater had him crammed into the van” establishes “disregard for the substantial risks to Bias’s health.”[25] None of the physicians or other health care providers who eventually diagnosed Bias were critical of the care that Sabater provided. They did not offer the objective evidence necessary to establish that at the time Sabater and the other health care professionals at the prison administered medical care, a substantial risk of serious harm to Bias existed. Bias did not have necrosis at that time. That condition undisputedly developed while he was in the van. Undoubtedly, Sabater and others failed to diagnose his drug overdose. But there is no evidence that the misdiagnosis even amounted to negligence. Nor is there evidence that placing Bias in a van, rather than an ambulance, posed a substantial risk of serious injury. A layman cannot make a determination that such a risk existed without the aid of expert testimony.
This is not a close case, and I must say that I am mystified by the reaction the videotape in this case has engendered. Respectfully, I must dissent.

. See Farmer v. Brennan, 511 U.S. 825, 828, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (holding that a prison official violates the Eighth Amendment only if she is deliberately indifferent "to a substantial risk of serious harm to an inmate.”).

. Estelle v. Gamble, 429 U.S. 97, 107, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

. Farmer, 511 U.S. at 836, 114 S.Ct. 1970.

. See, e.g., Estelle, 429 U.S. at 107, 97 S.Ct. 285 (1976).

. Farmer, 511 U.S. at 835, 114 S.Ct. 1970 (emphasis added).

. Id. (quoting Whitley v. Albers, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)).

. Estelle, 429 U.S. at 106, 97 S.Ct. 285.

. Id.

. Id. at 107, 97 S.Ct. 285.

. Id.

. 463 F.3d 339, 348 n. 29 (5th Cir.2006).

. Ante, p. 164.

. 463 F.3d at 345.

. Id. at 346 (internal quotation marks omitted).

. Id. at 348 n. 29 ("As we must focus on Caldwell’s [a physician’s] subjective knowledge, expert testimony cannot create a question of fact as to what Caldwell actually knew. Campbell v. Sikes, 169 F.3d 1353, 1368 (11th Cir. 1999) (‘[S]ince the facts and circumstances of this case do not allow an inference that Sikes not only should have perceived the risk but also actually did perceive it, does the opinion testimony by Plaintiff's medical experts based on those same facts and circumstances provide the missing Farmer link? The answer is no.’). We caution that the expert testimony is only probative of what inferences Caldwell, himself, could have made; whether he should have made the connection is irrelevant to this analysis.”).

. Id. at 349.

. Id. at 343-44.

. Id. at 349.

. Id. at 344.

. Id. at 346.

. Id. at 352.

. Id. at 347. The district court had ruled;
I ... think there are just too many issues of fact ... [concerning] whether he looked at the medical records; whether he should have seen LGobertj the amount of times he saw him; whether he was prescribing or not prescribing.... I just see too many material issues of fact dealing with what Dr. Caldwell did or didn’t do at appropriate times; whether he reviewed or didn’t review the medical records; whether or not other actions should have been taken; whether or not the records that were developed at the Earl K. Long Hospital were appropriately sent and filed in his record; *170 whether he even should have taken efforts to look at those records; whether x-rays should have been done earlier and reviewed earlier ... whether there was probative evidence that Dr. Caldwell did perceive the plaintiff had an infection prior to August 7, whether or not he appropriately relied on what the medical records were....

. 169 F.3d 1353 (11th Cir.1999).

. Id. at 1364.

. Ante, p. 164.