[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-14893
Non-Argument Calendar
_____

D.C. Docket No. 5:10-cv-02629-JEO

LESTER CARPENTER REED,

Plaintiff - Appellant,

versus

BILLY MITCHEM,
Warden; individually and official capacity, et al.,

Defendants,

CHARLES BROCK,
Lieutenant; individual and official capacity,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(September 1, 2017)

Before JULIE CARNES, JILL PRYOR and BLACK, Circuit Judges.

PER CURIAM:

Lester Carpenter Reed, an inmate at the Limestone Correctional Facility in Limestone County, Alabama, brought this suit pursuant to 42 U.S.C. § 1983 against Lieutenant Charles Brock, alleging Brock used excessive force against Reed during an altercation that occurred while Brock was employed at Limestone as a corrections officer. The case proceeded to a bench trial before a magistrate judge. The court entered judgment in favor of Brock and denied Reed's motion to amend the judgment, and Reed appealed. After review,[1] we affirm.

## I. BACKGROUND

*A. Factual Background*

The facts in this case are derived almost entirely from the testimony of two witnesses—Reed and Brock.[2] Predictably, their stories conflicted on the essentials. As a result, the outcome of the bench trial depended entirely on whose narrative the judge found credible. In relevant part, the testimony of each is as follows.

---

[1] Following a bench trial, this Court reviews factual findings for clear error and conclusions of law de novo. *Renteria-Marin v. Ag-Mart Produce, Inc.*, 537 F.3d 1321, 1324 (11th Cir. 2008).

[2] The only other witnesses at trial, Misty Haynes and Karen Marie Amborski, were medical personnel who testified as to the extent of Reed's injuries, but did not witness the incident.

2

*1. Reed*

At the time of the trial in August 2013, the 55-year-old Reed was still incarcerated at Limestone after having served 26 years.  Testimony elicited at trial showed that during that time, he had not always been the model inmate.  Cross-examination revealed that in 1995, Reed was charged with assaulting a Department of Corrections employee, even though on direct examination Reed asserted he had never been accused of using force against a prison official.  In addition, while serving his sentence, Reed has been quite litigious.  He began to develop his legal skills by filing lawsuits regarding the conditions in the HIV-positive unit in which he was housed.  Reed's self-taught litigation strategies included transferring his savings into other inmates' accounts in order to achieve indigent status and avoid having to pay court costs.

The events giving rise to the incident at issue in this case began when Reed orchestrated a scheme on behalf of a handful of other inmates to use an outside address to claim tax refunds.  Reed was to receive $100 from each inmate in exchange for the use of his sister's Lawrenceville, Georgia address, to which he would direct the inmates' federal refund checks through the use of a power of attorney executed by each inmate.  Reed would then have someone outside the jail cash the checks and send money orders back to the prisoners.

3

The participating inmates delivered their power of attorney forms to Reed on May 3, 2010.  Reed testified he was called into Brock's office later that day.  When he arrived, all four of the inmates who were to participate in the scheme were standing outside the office with their heads bowed.  According to Reed, when he entered Brock's office, Brock told him the four inmates did not want to be in Reed's income tax scheme, and ordered Reed to retrieve the powers of attorney and turn them over to Brock.  This made Reed angry, because he felt Brock had assumed Reed's involvement without asking for Reed's side of the story.  As a result, Reed refused to get the paperwork and told Brock to "go down there and get them damn forms yourself."  Reed testified that at that moment, Brock turned beet red and jumped up from his desk.  To Reed, he appeared extremely angry.  He ordered Reed to follow him outside the office and back to the dormitory to retrieve the documents.

According to Reed, Brock was walking briskly in front of him as they made their way to Reed's cell.  Brock radioed a superior officer and asked him to prepare a segregated cell for Reed.  He then placed his radio back on his hip, turned to Reed, and screamed, "Lester Reed, I don't like you; I ain't never liked you."  Reed replied, "well, whoopty-doo, lieutenant rump, I don't like you, and I ain't never like your bald-headed ass."  The two continued to walk toward the cell block, exchanging antagonistic sentiments as they went.

4

Reed and Brock arrived in the lobby to the dormitory where there was an observation post occupied by Officer Jimmy Hawkins.[3]  Brock called Hawkins down from the post and ordered Hawkins to escort Reed to his cell to pack his belongings.  Hawkins escorted Reed through the large riot door into the dormitory past Brock.  As they passed, and without any prompting, Brock said, "Reed, I ain't scared of you."  Reed replied, "I ain't scared of your bald head ass neither." Hawkins and Reed kept walking, and as they approached a stairwell that led to Reed's cell, Hawkins asked Reed what was going on.  Before Reed could reply, Brock "suddenly slammed into the back of [Reed's] neck, snapping [his] head backwards, and with enough force to send [him] stumbling forward."  He then stepped around Reed, placed him in a chokehold, and then "reached across [Reed's] face and twisted [his] neck all the way around and then bent [his] neck over [Brock's] left forearm, pressing down on it, and then lifting [Reed] straight up off the floor, like in a hangman's noose," with only Reed's toes touching the floor. Hawkins, shocked, jumped and asked excitedly what Reed had done.  Brock answered by ordering Hawkins to put Reed in handcuffs, and Hawkins complied. Reed contends he did not resist at all.

A significant portion of Reed's remaining testimony reviewed the extent of the injuries Reed suffered from Brock's headlock.  Although he had back problems

---

[3] Hawkins did not testify at trial.

dating at least to the time of his incarceration in 1988, Reed testified at length that Brock's use of force caused him significant additional spine and neck pain.

### 2. *Brock*

Brock was a corrections officer at Limestone at the time of the incident. He began working at Limestone when it opened and remained employed there until his retirement in August 2011 after 28 years of service. During his time at the prison, Brock underwent extensive use of force training and even served as an instructor.

Brock's testimony conflicts with Reed's in several key respects regarding the events giving rise to this lawsuit. First, Brock indicated that it was only Reed, and not Brock, that got upset during the initial confrontation in Brock's office. Brock asserts Reed started angrily cursing at him after he ordered Reed to get the power of attorney forms from his cell. Reed continued to refuse and curse even after Brock told him he would lock him up in segregation unless he followed orders.

Second, Brock testified he walked behind Reed as he escorted him to his cell, as Brock was trained to do, and that neither said anything to the other as they went. Rather, Brock testified, it was only as they entered the dormitory that Reed began raising his voice. Brock stated Reed "became real loud, yelling at [Brock] about that [Brock] was violating his constitutional rights, [Brock] didn't have any

6

rights to the damn forms." At no point did Brock utter the sorts of things to which Reed testified.

The third and most important difference between Reed's and Brock's testimony relates to the use of force itself. Brock stated that at the moment Reed was yelling, Brock took a step toward Reed when Reed turned abruptly toward him. Brock testified that the incident took place in front of the entire cell block in the dormitory, which housed nearly 150 inmates, and that the disturbance Reed created risked getting the other inmates riled up. In Brock's experience, this sort of excited confrontation can trigger a prison riot. Based on Reed's loud, angry, and threatening language and his quick turn towards Brock, Brock believed Reed posed a potential threat to him and immediately executed a maneuver known as a shoulder pin. Brock was trained to use this move, a so-called pressure point control tactic, because it restrains the inmate with only minimal risk of injury. Immediately after Brock performed the shoulder pin, Reed relaxed, at which point Hawkins cuffed him. Brock testified that he did not lift Reed off the ground as Reed claimed. After the situation had calmed down, Brock drafted an incident report that afternoon, as he was required to under prison regulations.

B. Procedural History

Reed brought suit against Brock, contending Brock's shoulder pin constituted excessive force in violation of the Eighth Amendment. After trial, the

magistrate judge ruled in favor of Brock.  Analyzing the use of force under the test set forth in *Hudson v. McMillian*, the magistrate judge found Brock's testimony was more credible than Reed's, and determined Brock's use of force was not applied "maliciously and sadistically to cause harm." 503 U.S. 1, 6–7 (1992). Accordingly, the court entered judgment in favor of Brock.  Reed filed a motion pursuant to Fed. R. Civ. P. 59(e), requesting the court amend its judgment in his favor and contending that even on the court's findings of fact, Brock violated Reed's constitutional rights.  The court considered Reed's arguments and denied the motion.

## II. DISCUSSION

On appeal, Reed again purports to accept the district court's findings of fact. He asserts that even accepting Brock's testimony, the court misapplied the *Hudson* factors.  His arguments, however, are unavailing.

"[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 at 6–7.  Certain objective factors may bear on this core inquiry, including "[1] the extent of injury suffered by [the] inmate . . . [,] [2] the need for application of force, [3] the relationship between that need and the amount of force used, [4] the

8

threat 'reasonably perceived by the responsible officials,' and [5] 'any efforts made to temper the severity of a forceful response.'" *Id.* at 7 (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986). "From consideration of such factors, 'inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.'" *Skrtich v. Thornton*, 280 F.3d 1295, 1300–1301 (11th Cir. 2002) (quoting *Whitley*, 475 U.S. at 321).

The parties agree that the first factor, the extent of Reed's injury, favors Reed, since he suffered acute neck and back pain after the incident. Given its findings of fact, however, the magistrate judge did not err in finding the remaining factors on balance weighed in favor of Brock.

Once it determined Reed was acting in an aggressive manner, as Brock testified, and that Reed made a quick movement in Brock's direction, the court found that the "evidence support[ed] the conclusion that Brock reasonably perceived a need for action." We find no error in this conclusion; the court was entitled to believe Brock that riots often begin with disturbances such as the one Reed was causing, and thus to determine that there was a "need for the application of force," the second *Hudson* factor. *Hudson*, 503 U.S. at 7. Similarly, the court was permitted to credit Brock's testimony that the shoulder-pin maneuver was

9

defensive and intended only to restrain unruly inmates, not to harm them.  Given

that determination, with respect to the third *Hudson* factor, the court did not err in

finding a reasonable and proportional "relationship between that need and the

amount of force used."  *Id.*  Likewise, Reed's loud and obnoxious behavior became

aggressive when Reed quickly turned towards Brock; his conduct was a "threat

reasonably perceived by the responsible official[ ]," namely, Brock.  *Id.* (quotation

omitted).  Finally, the court did not err in determining that there was too little time

to "temper the severity of a forceful response," the last *Hudson* factor.  *Id.*

(quotation omitted).  In any event, Brock's use of a measure designed only to

subdue but not to harm Reed indicates he used no more force than necessary to

diffuse the situation.  On balance, the *Hudson* factors indicate that Brock acted in

"a good-faith effort to maintain or restore discipline" rather than "maliciously and

sadistically to cause harm," *Hudson*, 503 at 6–7, and the trial court did not err in

entering judgment in his favor.[4]

---

[4] Reed cites numerous cases in support of his contention that the *Hudson* analysis should come out in his favor.  Most of them are not binding on this Court.  Of those that are, none found excessive force.  Thus his argument that Brock's conduct violated the Eighth Amendment because "this Court has found justification on the basis of conduct by a prisoner substantially more egregious than the conduct described by Mr. Brock" is a non sequitur.  The fact that we have ruled in favor of defendant officers in cases where the plaintiff inmates were guilty of "substantially more egregious" conduct than Reed is in no way inconsistent with the trial court's determination that Reed's comparatively less egregious conduct did not also justify Brock's relatively mild use of force.  Reed's cases are unavailing, and we conclude the trial court's straightforward application of the *Hudson* factors to this case was not error.

## III. CONCLUSION

For the foregoing reasons, the judgment of the district court is

**AFFIRMED.**