**Duat Abdut DUAMUTEF, Plaintiff,**

v.

**Thomas FIAL, D. Montgomery, D. Spinks, S. Lambert, Gregory Foster, P. Foley and Dennis Smith, Defendants.**

No. 90–CV–0946L.

United States District Court, W.D. New York.

April 26, 1996.

---

Michael R. Mendola, Chamberlain, D'Amanda, Oppenheimer & Greenfield, Rochester, NY, for plaintiff.

James L. Gelormini, Office of New York State Attorney General, Rochester, NY, for defendants.

## DECISION AND ORDER

FELDMAN, United States Magistrate Judge.

### INTRODUCTION

This civil rights action was commenced by plaintiff Duat Abdut Duamutef (Duamutef) against defendants, all present or former employees the New York State Department of Corrections ("DOCS"). Duamutef alleges that while he was incarcerated at the Attica Correctional Facility (Attica) the defendants savagely beat him without justification causing serious physical injury. Invoking the prohibition against "cruel and unusual punishments" found in the Eighth Amendment to the United States Constitution, Duamutef brought this action in federal court pursuant to 42 U.S.C. § 1983.

Plaintiff commenced this action *pro se.* Prior to trial, the Court assigned Michael R. Mendola, Esq. of the law firm Chamberlain, D'Amanda, Oppenheimer and Greenfield to represent Duamutef.[1] The matter was tried to the Court on April 1 and April 2, 1996. During the trial, the Court took testimony from plaintiff and eleven defense witnesses. In addition, numerous documents and photographs were stipulated into evidence by the parties, including medical records and photographs. This decision constitutes my findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

### THE EVENTS OF FEBRUARY 10, 1990

On February 10, 1990 a disturbance occurred at the Attica Correctional Facility. By the time the disturbance ended, Duamutef and several guards were rushed to nearby hospitals with serious injuries. Aside from the date and time of the relevant incident, the testimony of plaintiff and the defendants as to what provoked the melee and how the injuries were sustained could not have been more divergent. Because the plaintiff and defendants version of what occurred on February 10th differ so substantially, my findings of fact are necessarily dependent on issues of credibility. Therefore, it is necessary to recite in some detail the testimony offered by both Duamutef and the defendants.

***Plaintiff's Evidence:*** In February, 1990 Plaintiff Duamutef was incarcerated at Attica serving a sentence of fifteen years to life after a felony conviction he sustained in 1984. On February 10, 1990 Duamutef was housed in the "keeplock area" of the prison which required him to be confined to his cell for 23 hours each day. The "keeplock" unit of Attica was part of a larger "block" known as the "B" block area. While confined in "keeplock" Duamutef was permitted, upon request, to spend one hour each day out of his cell for recreation.

On February 10, 1990 Duamutef signed up to participate in the morning recreation period. The recreation yard used that morning for "keeplock" inmates was the "D" block yard. According to Duamutef, he spent most of his hour of recreation that morning walking around the yard with another inmate.

At the conclusion of the recreation period, prison procedure required a guard to open an outside door and bring the inmates back into the prison area in groups of five. The five inmates would re-enter the prison from the recreation yard and stand, single file, in an interior hallway known as the "B" corridor where they were to line up behind a designated yellow line and wait to be escorted back to their cells. Once the five inmates had left the "B" corridor, five more inmates would be called in by the guards. This procedure was repeated until all the inmates in the recreation yard had been safely returned to their cells.

Duamutef testified that on the morning of February 10th, defendant Thomas Fial (Fial), a prison guard stationed at the door to the D Block yard, opened the yard door and announced that the recreation period was ending. Fial requested five inmates to enter the "B" corridor. Duamutef testified that he and four other inmates walked into the corri-

---

1. This Court acknowledges the efforts of Mr. Mendola in the trial of this matter. He fulfilled his responsibilities as an advocate for Mr. Duamutef with vigor and professionalism. Mr. Mendola's willingness to undertake representing plaintiff on a *pro bono* basis is commendable and appreciated by all the members of this Court.

dor to line up behind the yellow line. Inside the corridor along with Fial were defendants Scott Lambert (Lambert), David Montgomery (Montgomery) and Lon Midkiff, Jr. (Midkiff), all guards employed at Attica.

Duamutef testified that as he approached the yellow line, he heard a commotion behind him. Duamutef stated that he remembers another inmate in the corridor, identified only as Price, "said something", although Duamutef was unable to hear exactly what was said. As Duamutef started to turn to see what was happening, he claims that Lambert engaged him in an unprovoked attack and struck him in the back of the head with a baton. After being struck, Duamutef turned and saw Price pinned against the corridor's wall by Fial and two other guards. As he fell to the ground from the blows to his head, Duamutef claims that Montgomery struck him in the face. Thereafter, other guards joined in a savage assault of Duamutef, repeatedly hitting, punching and striking his body and face. Duamutef testified he was struck by defendants Fial, Midkiff, Patrick Foley (Foley) and Dennis Smith (Smith). As he was turned over on his stomach to be handcuffed, Duamutef claims defendants continued to beat him. Once restrained, Duamutef claims to have lost consciousness. The next event he remembers was waking up in the Attica Correctional Facility infirmary.

According to Duamutef, the assault that began in the "B" corridor continued in the Attica infirmary. Duamutef's testimony accused defendant David Spinks (Spinks) of deliberately over-tightening leg restraints which had been placed on both his ankles, causing him extreme pain. Duamutef also testified that while he was in the Attica infirmary Spinks hit him, held a baton to his neck, choked him, and stated that "we are going to murder you". Duamutef stated that he lost consciousness again in the infirmary and did not awake until he had arrived at the Erie County Medical Center in Buffalo, New York. Duamutef claims to have no recollection of being transported by ambulance from Attica to the Erie County Medical Center.

Duamutef remained hospitalized for several days. He testified that the actions of the various defendants caused him to suffer bro-

ken bones in his face and injuries to his legs. Photographs were introduced by plaintiff depicting injuries to his face, his head and legs. (plaintiff exhibits 4–8). Medical records were also introduced by Duamutef (plaintiff exhibit 3) indicating that he suffered lacerations of his scalp, his eyebrow and fractures through his anterior and lateral maxillary antrum facial bones. Duamutef testified that he has suffered vision problems and headaches from the blows to the head and face he sustained.

As to a possible motive for the defendants unprovoked beating, Duamutef testified that he believed he was the victim of a "conspiracy" among the defendants to punish him for a class action lawsuit he intended to file against Attica seeking legal redress for what he perceived to be inhumane living conditions for Attica's "keeplock" inmates. Duamutef denied ever striking, hitting, kicking or intentionally using any force on any guard on the morning of February 10, 1990. During cross-examination, Duamutef stated he had a black belt in three forms of martial arts.

**Defendants Evidence:** Through its eleven witnesses, the defense presented an entirely different version of the events of February 10, 1990. A summary of the testimony of each defense witness is set forth below.

1. *Scott Lambert:* Defendant Lambert has been a "DOCS" employee for fifteen years and was assigned to the "B" block of Attica on February 10, 1990. Lambert testified that on the morning of February 10th he looked into the "D" yard recreation area from his position in "B" block and observed a group of about twenty inmates standing near a weight lifting area. The gathered inmates were being addressed by a lone inmate who was standing on a weight bench. Lambert testified that such a gathering was a cause for concern because Attica policy forbids the assembly of more than six inmates at a time. Lambert immediately notified another guard of the inmate gathering and then continued to observe the events taking place in the recreation yard.

According to Lambert, as he was watching the gathering in the yard he saw what he described as a "loud commotion" and then

observed about twenty inmates yelling, screaming and trying to rush in from the recreation yard into the "B" block corridor. Because the inmates were trying to enter the corridor all at once and not in the normal groups of five, Lambert testified that he quickly ascertained there was a problem. Lambert ran from his post to the lobby outside the "B" corridor. When he arrived he observed several inmates and guards in the hallway fighting. With respect to Duamutef, Lambert testified he observed Duamutef and inmate Price assaulting guard Thomas Fial by striking Fial on the head and upper body with guard issued batons.

Lambert immediately ran to assist Fial. According to Lambert, Fial was wrestling with inmate Price. As Fial was wrestling with Price, Duamutef was standing to the side swinging a baton and repeatedly striking Fial in the head. Lambert testified he heard and saw Fial getting hit in the head by plaintiff's blows. Lambert stated that Duamutef was intense in his desire to strike Fial and described Duamutef as acting like he was "trying to take his [Fial's] head off with that stick". Lambert described the sound of the baton hitting Fial's head as "sickening".

As Lambert approached Fial, he told Duamutef to drop the baton. Duamutef refused. Lambert testified that he repeated this order at least twice more and Duamutef continued to ignore his command. Duamutef then began swinging the baton at Lambert and Lambert responded by swinging his own baton at Duamutef. According to Lambert, Duamutef got into a fighting stance described as a "bladed position" and began swinging the baton adeptly. Lambert described plaintiff as a "skilled fighter". Lambert tried to disarm Duamutef by striking him with his baton. According to Lambert, he and Duamutef were engaged in "an all out fight" and that Duamutef was "trying to take me out".

Lambert was struck by Duamutef in his left knee, his left elbow and his legs. Lambert fought back and hit Duamutef in his upper body and chest. According to Lambert, there was also a "good possibility" that he struck Duamutef on his head.

As Duamutef and Lambert were fighting, additional guards responded to the "B" corridor. Lambert related that other guards also struck Duamutef and Duamutef eventually fell to the ground. After Duamutef fell, Lambert testified he went back to assist Fial who was still being assaulted by inmate Price. Price was eventually subdued and Fial was immediately taken to the Attica infirmary. Once subdued and cuffed, Lambert testified he saw Duamutef on a gurney being taken to the Attica infirmary. Although restrained, Lambert stated that Duamutef was thrashing about and yelling obscenities.

Lambert sustained serious injuries and was taken to Warsaw Community Hospital. He sustained a fractured left elbow, was out of work for six weeks and testified that he still has restricted movement in his left arm. Lambert also testified that he does not specifically recall meeting or working with Duamutef prior to Duamutef assaulting him on February 10th.

2. *Thomas Fial:* Defendant Fial is also a guard assigned to the Attica Correctional Facility. On February 10, 1990, Fial's assignment was to supervise the "keeplock" recreation period. During the recreation period, Fial recalled that he was informed that inmates had been gathering around a weight area and to "be careful" when letting the inmates back into the facility. At the conclusion of the recreation period, Fial opened the door to call five inmates in. Fial testified that not one inmate entered the door, a fact he viewed as very unusual because the inmates are usually waiting to re-enter the prison door at the conclusion of the recreation period. Fial stated that he opened the door again and yelled for five inmates to come in. This time, three inmates came in "real quick". Fial yelled for two more inmates to enter the corridor. Only one more inmate responded and entered the corridor.

Immediately after the fourth inmate entered the corridor, Fial testified he heard "a loud noise at the end of the corridor". Fial was in the process of closing the door when he heard the commotion. Fial testified his main concern was getting the door to the yard closed. As he pulled the door closed,

Fial looked out the small window that was part of the door and saw several inmates rushing towards him. According to Fial, he was able to close the door "just in time". Fial quickly locked the door and stuck the key in his pants. As he was turning away from the door to look at the commotion in the corridor, Fial testified that inmate Price attacked him with a baton. Fial testified that Price was using overhead blows, repeatedly striking him on his head. Fial tried to get as close to Price as possible so as to inhibit Price's ability to take a full swing with the baton. Fial stated that he did not have time to get his own baton out to defend himself. As he moved in, Fial grabbed Price in a "bear hug" and began wrestling with the inmate. Fial testified that as he and Price were wrestling he was struck in the back of the head with a baton. He looked up and saw Duamutef striking him repeatedly. Fial tried to use Price as a human shield to protect himself from Duamutef's blows. Fial stated that at least one blow from Duamutef struck Price. At that point, according to Fial, blood was "all over the place." Fial testified he was hit with a baton at least seven times and most all of the blows he sustained were in his head area.

As other guards arrived to assist, Fial stated that he passed out. Fial remembers waking up in the Attica infirmary and shortly thereafter being transported to a hospital in Batavia, New York. Fial testified that he never struck Duamutef during the entire incident.

Fial suffered severely bruised arms and a concussion. He was out of work for two months and suffered extremely severe headaches. Because of the incident, Fial was afraid to return to work at Attica and saw a psychiatrist to help him deal with his stress and anxiety. Fial stated he never knew Duamutef or Price prior to their attack of him. Fial testified that the violence directed towards him by Duamutef and Price during the melee made him scared for his own life.

3. *Dennis Smith:* Defendant Dennis Smith, a "DOCS" employee for eight years, was assigned to the Attica Correctional Facility in February 1990. Smith testified that on February 10, 1990, his responsibilities in-

cluded watching the movement of "keeplock" inmates as they were summoned in from the recreation yard. According to Smith, just before the "keeplock" recreation period ended, he would be notified by telephone to begin observing the recreation yard as the "keeplock" inmates returned inside the prison facility.

On February 10th, Smith recalled that he saw Thomas Fial open the door to begin to let the inmates back into the facility. Smith observed three inmates enter the door to the "B" corridor and then saw the door shut. Moments later, Smith saw the door open again and one additional inmate enter the "B" corridor. After the lone inmate went in, Smith testified he saw the rest of the inmates, estimating them to be 20 to 25 in number, "rush" the door leading to the "B" corridor. Upon observing this disturbance, Smith immediately began banging his own baton against the prison walls and bars, a standard warning signal to other guards that there was a disturbance and guard assistance was immediately needed. Smith himself ran downstairs to the "B" corridor to offer his assistance.

When he got to the "B" corridor, Smith testified he observed Duamutef striking Thomas Fial. According to Smith, Duamutef was swinging as hard as he could at Fial while Fial was holding inmate Price as a shield. In Duamutef's efforts to strike Fial, Smith saw Duamutef miss and strike inmate Price by mistake. As Smith approached Duamutef, he ordered Duamutef to drop the baton. Duamutef ignored the order, turned towards Smith and began swinging at Smith's head. Smith testified that he was able to block Duamutef's initial blows with his own baton. As their battle continued, Smith and Duamutef exchanged blows. Duamutef struck Smith's left leg and Smith responded by hitting Duamutef on his leg and arms. According to Smith, his blow to Duamutef's leg caused Duamutef to fall. While on the ground, Duamutef continued to struggle. As Smith approached the fallen Duamutef, the inmate drew his leg up and gave a "karate kick" to Smith's left knee. The kick dislocated Smith's left kneecap. Smith testified he missed seven days of work as a result

of Duamutef's assault. Smith testified that he felt the disturbance was a "life threatening situation" and that "the force used was necessary to quell the situation".

4. *Patrick Foley:* Defendant Patrick Foley testified that he had been a "DOCS" employee for eleven years and in February 1990 was assigned to Attica's third floor. On the morning of the 10th, Foley received word that there may be a problem in the "B" corridor and was instructed to lock all inmates he was supervising in their cells. Foley was then directed to go downstairs to the "B" corridor to assist other correction officers. As Foley approached the "B" corridor, he heard batons being used and individuals screaming. He ran into the "B" block lobby and saw Duamutef swinging a guard issued baton in a "wild fashion". Foley immediately proceeded into the "B" corridor with two other guards in order to subdue Duamutef. Duamutef initially ran away from Foley but then turned and started coming back towards him. Foley stated he got in a defensive position as Duamutef approached swinging a baton. Foley testified he thought Duamutef was going to try to injure or kill him. Foley was able to strike Duamutef two times in Duamutef's upper torso. Duamutef fell to the ground and three guards were immediately on top of Duamutef trying to subdue him. According to Foley, Duamutef continued to struggle and was not unconscious while he was being subdued in the "B" corridor. Foley suffered no serious injuries and testified that he did know Duamutef prior to their battle on February 10, 1990. On cross examination, Foley admitted that it was possible that he could have hit Duamutef on the head during their battle.

5. *Robert Kilpatrick:* Robert Kilpatrick, a lieutenant at the Attica Correctional Facility, testified that on February 10, 1990 he responded to an emergency alarm and reported to the "B" corridor. By the time he arrived, Kilpatrick said the situation was "under control" and Duamutef was in the process of being subdued. Kilpatrick observed guards who had been injured in the fight. Kilpatrick, being a supervisor, testified that he took control of the situation and directed that the injured be taken to the Attica infirmary immediately.

Kilpatrick observed Duamutef lying on the ground as guards applied restraints to Duamutef's legs and wrists. Kilpatrick said Duamutef was conscious and was struggling. Kilpatrick went with Duamutef to the Attica infirmary. Although conscious, Duamutef refused to respond to questions in the infirmary and continued to struggle. Photographs were taken of Duamutef. Duamutef refused to speak to the infirmary's medical staff. Kilpatrick testified that he never observed Duamutef being hit, kicked or harmed while in the Attica infirmary. Kilpatrick stated that Duamutef was conscious the entire time that he observed him.

6. *Gregory Foster:* Defendant Gregory Foster, a "DOCS" employee for over seven years, had only been working at the Attica Correctional Facility for three days prior to February 10, 1990. On the morning of February 10th, after hearing the emergency signal of batons slapping the bars and walls, Foster recalled running to the source of the commotion. Looking down "B" corridor, Foster stated he observed fellow guard Thomas Fial being hit by inmates in the vicinity of the corridor door leading outside to the recreation yard. Foster identified Duamutef as one of the inmates striking Fial. Foster described Fial as being in a "crouched position" holding his hands over his head to protect himself from Duamutef's repeated overhand blows to Fial's head. Foster testified that he drew his own baton and immediately went to assist Fial. As he approached Fial, Duamutef turned towards Foster and began striking Foster, hitting him in his left leg and chin. Foster testified that Duamutef was swinging the baton in rapid "figure eight" motions.

Foster testified that he tried to get in close to Duamutef so as to be able to disarm him by removing the baton from Duamutef's hand. As he approached, Duamutef was able to hit Foster in his left leg and Foster fell to the ground. Once Foster was on the ground, Duamutef turned away and started striking Fial again. Foster testified that once he was able to get up, Duamutef began striking him again. Two other guards arrived and dove

on top of Duamutef taking him to the floor. Foster testified that Duamutef was struggling and screaming as he was being subdued and that Duamutef may have struck his head on the floor as he was taken down and subdued by the guards. Foster stated Duamutef was not unconsciousness and that he never saw anyone strike Duamutef as he was being cuffed and subdued.

After the incident, Foster was taken to the infirmary for medical attention. While in the infirmary Foster again saw Duamutef, describing him as still thrashing around and screaming. Foster was taken by ambulance to St. Joseph's Hospital where he was treated for both leg and head injuries. Foster's chin was split open requiring six stitches and resulting in permanent facial scarring. His leg injury was also severe and necessitated rebuilding the muscles in his left leg. Foster underwent extensive physical therapy and was unable to work for eleven weeks. Foster testified that he had no knowledge of Duamutef prior to this incident.

7. *Lon Midkiff, Jr.:* Lon Midkiff, Jr. testified that he was a 21 year employee of "DOCS" prior to his retirement in October 1992. Midkiff spent most of his 21 years with DOCS assigned to Attica, having been promoted to the rank of sergeant in 1983. Midkiff testified his duties on the morning of February 10, 1990 included assisting Thomas Fial in summoning "keeplock" inmates from the recreation yard back inside the prison. Midkiff recalled directing Fial to open the door and call for five inmates to come in. Midkiff testified after four inmates came into the "B" corridor, all of those who had entered "took off" towards the "B" block gate. After his order for them to stop was disobeyed, Midkiff testified that inmate Price attacked him, hitting him in the head, right shoulder and right rib cage. During the assault, Midkiff testified that his baton was taken from him.

After struggling with inmate Price, Midkiff stated he was able to disengage himself and pulled an emergency pin from his hand held radio thus sounding an alarm to other guards. Midkiff recalls help arrived on the scene almost immediately. Midkiff testified he never saw Duamutef being struck by guards. After the incident was over Midkiff was taken to the infirmary where three stitches were needed to close the wound in his head. Midkiff was out of work for ten days. Midkiff testified he knows Duamutef from his years at Attica and has seen Duamutef practicing martial arts skills while in his cell.

8. *David Montgomery:* Defendant David Montgomery, a "DOCS" employee since 1972, was assigned to Attica's second floor reception area on February 10, 1990. Montgomery recalled hearing a distress signal and immediately responded to the scene of the disturbance. Montgomery testified that he had to run over three hundred yards from his duty station to get to the "B" corridor.

When he entered the "B" corridor Montgomery observed a commotion involving inmates and staff and observed Duamutef on the floor struggling as guards tried to subdue him. Montgomery stated he went over to assist officers in subduing plaintiff and "grabbed [Duamutef's] head to try and subdue him". According to Montgomery, Duamutef turned and bit Montgomery's finger, breaking the skin and drawing blood. Montgomery stated that Duamutef was conscious as he was being subdued and that he never witnessed any guard strike Duamutef with a baton. As to his conduct, Montgomery testified that he did not strike, hit, kick or punch Duamutef at any time. Montgomery testified he was not even issued a baton that day.

After the situation was under control, Montgomery stated he saw Duamutef being placed on a gurney and sent to the Attica infirmary. Like most of the other defendants, Montgomery stated he did not know Duamutef prior to this incident.

9. *David Spinks:* Defendant David Spinks testified he had been a "DOCS" officer for twenty-one years and on February 10, 1990 was assigned to the Attica Correctional Facility as a transportation officer. As a transport officer, Spinks' duties included assuming responsibility for inmates if they needed to be taken out of the facility.

On the morning of February 10th, Spinks testified that he was ordered to report to the infirmary and, upon arrival, observed Dua-

mutef on a stretcher being attended to by prison medical staff. Spinks testified he waited in the infirmary area until an ambulance arrived to take Duamutef to the hospital. When the ambulance arrived, Duamutef was placed in Spinks' custody for transport out the facility. Spinks testified that prison procedure required that any inmate leaving the prison be restrained by a waist belt, leg irons and handcuffs and, accordingly, those restraints were placed on Duamutef. Spinks rode in the ambulance with Duamutef to the Erie County Medical Center. Spinks denied striking Duamutef in the infirmary and stated he did not recall ever having any substantive contact with Duamutef prior to this incident.

10. *Louis J. Lang:* Louis Lang, an investigator with the New York State police for over 25 years, testified that in February, 1990 he was assigned to the Batavia office of the State Police. After hearing on the State Police radio of a prison disturbance at Attica, Lang called Attica and was requested to report to the prison immediately. Lang testified that he and fellow trooper Jack Tuttle drove to Attica together.

Upon their arrival, Tuttle and Lang checked in at the main administrative building and were directed to report to the "B" corridor. By the time they arrived, the corridor had been cleared. Lang and Tuttle proceeded to the infirmary. When they arrived, Duamutef was in the infirmary. After identifying themselves, Lang testified he asked Duamutef if he could speak to him about what had happened. Duamutef declined to speak to Lang. Lang testified that during the time he was in the prison infirmary, Duamutef's eyes were open and he was looking around. Lang also testified he took Duamutef's photograph in the infirmary (plaintiff's exhibit 4 and 5) but described Duamutef as extremely uncooperative during the photographic session, deliberately holding his eyes closed as his picture was being taken.

11. *Thomas Edwards:* Thomas Edwards testified he had been a "DOCS" employee for fourteen years and in February 1990 was working as a physicians assistant at the Attica Correctional Facility. Edwards was in the Attica infirmary at the time both inmates and guards were being treated on February 10th. Edwards testified he did not see any inmate being struck, punched or kicked by any Attica staff member while they were in the infirmary.

Edwards testified he also reviewed plaintiff's medical records documenting the treatment plaintiff received in the Attica infirmary on February 10, 1990. According to Edwards, there was no notation on the medical records that would suggest that plaintiff suffered any loss of consciousness. Without objection, Edwards opined that if there were any indication of loss of consciousness, such a condition would have been noted on the inmate's medical record by infirmary staff as loss of consciousness has a profound impact on a patient's diagnosis and treatment.

## DISCUSSION

The Eighth Amendment prohibits the infliction "cruel and unusual punishments." *U.S. Const. amend. VIII.* "After incarceration, only the unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (internal quotations and citations omitted). In considering whether an Eighth Amendment violation has occurred, the Court must examine both the objective and subjective components of the claim.

> The objective component of the alleged violation relates to the seriousness of the injury. The Eighth Amendment excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of the force is not of a sort repugnant to the conscience of mankind. The subjective component relates to whether the defendant possessed a "wanton" state of mind when engaging in the alleged misconduct.

*Branham v. Meachum,* 77 F.3d 626, 630 (2d Cir.1996) *quoting Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (internal citations and quotations omitted). What must be established with respect to each component "varies according to the na-

ture of the alleged constitutional violation." *Hudson,* 503 U.S. at 5, 112 S.Ct. at 997–98.

■ The **objective** component of an Eighth Amendment claim arising from allegations of excessive use of force requires only that the plaintiff establish he suffered more than *de minimis* pain or injury. *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999, 1000. Duamutef has established the objective component of an Eighth Amendment claim. His injuries were more than *de minimis* and far more significant than those found sufficient by the Supreme Court to establish the objective component in *Hudson.*

■ The **subjective** component of an Eighth Amendment claim requires that the offending conduct be "wanton". "Wantonness does not have a fixed meaning, but rather must be determined in relation to the type of conduct on which the suit is based." *Robins v. Meecham,* 60 F.3d 1436, 1440 (9th Cir.1995). In the context of force used to quell a prison disturbance, prison officials must often act "in haste, under pressure and frequently without the benefit of a second chance." *Whitley v. Albers,* 475 U.S. at 320, 106 S.Ct. at 1084. Accordingly, in these circumstances, in order to prevail on an Eighth Amendment claim, Duamutef must prove that force was not applied in a "good faith effort to maintain or restore discipline" but instead was applied "maliciously and sadistically for the very purpose of causing harm." *Id.* at 320–321, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)). Several factors must be examined in determining whether prison officials acted maliciously and sadistically. These factors include:

[1] the need for application of force, [2] the relationship between that need and the amount of force used, [3] the threat "reasonably perceived by the responsible officials," and [4] "any efforts made to temper the severity of the forceful response."

*Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. (citations omitted).

■ Viewing the trial evidence in the light of these established legal principles, I find that the plaintiff has failed to demonstrate that the application of force used on the morning of February 10, 1990 was applied "maliciously and sadistically" and therefore his Eighth Amendment claim must fail. Indeed, if anything, the evidence demonstrated that the only malicious and sadistic use of force used that morning was not meted out by the defendants, but by the plaintiff.

Initially I note that Duamutef's testimony that he was subjected to an unprovoked and savage physical beating at the hands of numerous correctional officers both in the "B" corridor and again in the prison infirmary was implausible and unconvincing. According to Duamutef, the motive for the defendants to beat him arises only from his intention to file a class action lawsuit against Attica officials in relation to the living conditions imposed on "keeplock" inmates. Yet, on cross-examination, Duamutef conceded that he never informed any of the defendants of his plan to file a class action lawsuit, none of the defendants were in a position to change institutional policy regarding "keeplock" inmates, none of the defendants had ever filed an incident report against him in prison, none of the defendants had ever been a defendant in a previous lawsuit filed by him and, indeed, none of the defendants had ever even had any prior substantive contact with him. To suggest that these seven defendants, who were working in different areas of the prison, with different responsibilities and duties, somehow planned to beat the plaintiff unconscious in front of other inmates and prison staff was simply not credible.

Plaintiff's claim that he never struck a single blow to any correction officer that morning was similarly unconvincing. The injuries suffered by the defendants and others indicate an infliction of brutality on a scale far greater than suffered by plaintiff. Defense witnesses identified Duamutef as striking repeated blows against prison guards and their first hand observations, when viewed in conjunction with the injuries sustained by the guards, convinces me that their testimony was credible. Duamutef himself testified that he has a black belt in three different forms of martial arts. The injuries sustained by the guards, including many of the defendants, pay tribute to the

fighting skills possessed by Duamutef. The testimony of the injured defendants as to how Duamutef used a baton to skillfully attack each of them until he was finally subdued was detailed and convincing. While there were some differences among the defendants accounts, those differences were not substantive and indeed were not unexpected given the fact that the events in the "B" block corridor were "occurring rapidly and in a highly charged atmosphere." *Haywood v. Koehler,* 78 F.3d 101, 105 (2d Cir.1996). Duamutef's claim that he lost consciousness after being beaten by the defendants in the corridor and again in the infirmary was not credible given the strength of the opposing testimony. Even if the Court discounts the testimony of the defendants who observed Duamutef yelling and struggling after being subdued, several non-party witnesses (Louis Lang, Thomas Edwards and Robert Kilpatrick) also observed Duamutef fully conscious in both the "B" corridor and in the infirmary.

Based on the evidence adduced at trial and my determinations as to the credibility of the witnesses presented, it is my view that what happened in the "B" corridor on the morning of February 10, 1990 was nothing short of a prison riot instigated and implemented by Duamutef and fellow inmate Price. While inmate Price was subdued within seconds, Duamutef's skills in the martial arts permitted him to wreak havoc and cause serious injuries to numerous guards responding to the disturbance.

 The conduct of each of the defendants was reasonable and appropriate given the obvious need for the application of force to quell the melee and subdue the plaintiff. "Prison administrators ... should be accorded wide ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). When the "ever present potential for violent confrontation and conflagration ripens into **actual** unrest and conflict, the admonition that a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators carries special weight." *Whitley v. Albers,* 475 U.S. 312, 321, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986) (emphasis in original) (internal quotations and citations omitted). It must be remembered that guards confronted with a prison disturbance, and, as here, an inmate using a prison issued lethal weapon, must make their decisions how to diffuse the situation "in haste, under pressure and frequently without the luxury of a second chance." *Whitley v. Albers,* 475 U.S. at 320, 106 S.Ct. at 1084. It is without hesitation that I find that the plaintiff failed to meet his burden of proof on the claimed violation of the Eighth Amendment.[1]

## CONCLUSION

The core judicial inquiry which this Court must make is "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Whitley,* 475 U.S. at 320–321, 106 S.Ct. at 1085. Based on the evidence presented at trial, I find that the force used by the defendants towards plaintiff on February 10, 1990 was applied in order to protect the safety of other inmates as well as the staff of the correctional facility and was not performed maliciously and sadistically to cause harm. I therefore determine and direct that plaintiff's complaint be and hereby is dismissed.

---

1. Plaintiff's *pro se* complaint also alleged that as a result of the February 10, 1990 disturbance plaintiff was subjected to solitary confinement without procedural due process. During a pretrial chambers conference, counsel for plaintiff indicated to the Court that the procedural due process claim was not going to be pursued at trial and, indeed, no evidence regarding the due process claim was presented at trial. Accordingly, to the extent plaintiff alleged a due process violation, such a claim is also dismissed for lack of evidence.