**Samuel J. HUDAK, Plaintiff,**

v.

**Dr. Bert MILLER, Defendant.**

**No. 95 Civ. 3028(SS).**

United States District Court,
S.D. New York.

Aug. 21, 1998.

Doyle & Broumand, LLP, Bronx, NY, Cathy O'Donnell, for Plaintiff.

Maccartney, Maccartney, Kerrigan & Maccartney, Nyack, NY, Harold Y. MacCartney, Jr., William K. Kerrigan, Mary E. Brady, for Defendant.

### OPINION AND ORDER

SOTOMAYOR, District Judge.

The plaintiff, Samuel J. Hudak, brings this civil rights action pursuant to 42 U.S.C. § 1983, alleging that the defendant, an attending physician at the state prison where plaintiff was incarcerated, violated his Eighth Amendment fights by his deliberate indifference to plaintiff's chronic headaches, which ultimately turned out to be caused by a large aneurysm. The defendant moves for summary judgment. For the reasons to be discussed, the Court denies the defendant's motion.

### BACKGROUND

Plaintiff Hudak was incarcerated at the Rockland County Correctional Facility from September 29, 1994 to June 14, 1995. The defendant, Dr. Burton D. Miller, was one of two physicians who attended the medical clinic located in the prison.

Hudak first sought medical attention at Rockland on October 15, 1994, approximately two weeks after his admission to the prison facility. On that day, he was seen not by the defendant but by Dr. Michael Antoine, the other physician in the prison clinic. Hudak complained of migraine headaches affecting the right parietal lobe, top of head and right eye, and Antoine noted that Hudak had migraines in the past. Hudak also complained to Antoine of nausea, difficulty eating, and insomnia.

On October 24, 1994, Hudak registered complaints with the clinic that his medication was not working to correct his chronic headaches, and he was given an appointment to see one of the doctors. The next day, Hudak saw the defendant Dr. Miller for the first time. Dr. Miller noted that Hudak complained of a "long history" of headaches and insomnia; Miller prescribed Motrin (ibuprofen) for the headaches and Benadryl for the insomnia.

On November 15, 1994, Hudak again complained to Dr. Miller of insomnia and headaches; Dr. Miller prescribed Benadryl. Hudak's next visit to the clinic was on January 31, 1995, although there were several renewals of medications in the interim (none by Dr. Miller). On January 31, Hudak saw Dr. Miller and again complained of intermittent headaches, this time requesting narcotics, which Dr. Miller denied but prescribed Tylenol.

Later that evening, Hudak was interviewed by someone in the clinic staff, who noted in the record the following conversation:

> Inmate states that he is concerned about his headaches and wants to make sure he doesn't have a "brain tumor." He stated that he started getting headaches in 1993. He describes his H/A's as / [right] sided behind his eye. He states he has them every morning.

The staff person then reported Hudak's heavy caffeine and tobacco intake, and also noted that when asked about stress, Hudak stated he "works out, reads, watches TV and feels he gets along with the other inmates in pod." Hudak also signed release forms to get his medical records from his prior incarcerations.

On February 2, 1995, Hudak made a written request to Louise Schwall, the prison clinic administrator, for "more attention in regard to his complaint of headaches, which

have apparently increased since his Benadryl order was completed." Schwall noted that his previous medical history would be requested, and that same day the prison clinic obtained a release and faxed it to Lakeview Shock Correctional Facility. The clinic followed up on the request on February 7 and was informed that as soon as the records came from storage they would be forwarded. A new request was faxed to Lake View on March 8. It is unclear, however, whether the records were ever forwarded to Rockland.

On February 9, Hudak again visited the clinic, this time seen by a doctor other than the defendant—presumably Dr. Antoine. Hudak complained of "right temporal headache" and "right eye pain" for one year approximately three times a week, and said he was experiencing "sharp throbbing pain" along with nausea and vomiting. Antoine noted that he "doubts migraine H/A" but that it may be an atypical migraine. On March 2, Antoine again saw Hudak and reported complaints of recurrent migraine headaches three times a week.

On March 7, Dr. Miller noted that he and Dr. Antoine had discussed Hudak's case, that they agreed that he did not have typical migraines and probably did not have a serious problem, but that they would each do a thorough neurological exam of Hudak. Dr. Miller conducted his neurological exam of Hudak on March 14. Hudak related to Dr. Miller that his headaches began one-and-one-half years prior—"starting after he was incarcerated." Hudak described the headaches as "increasing—point on left temple and then apex of skull—followed by feeling of 'bubbles' going behind his eye to top [of] head." Hudak further related that the headaches lasted a few minutes or all day long, and he also denied having other stresses. After performing the neurological examination, Dr. Miller expressed his belief that Hudak's complaints are "tension headaches," and that he "doubts significant CNS [central nervous system] pathology."

On March 16, Dr. Antoine conducted his neurological examination of Hudak. Hudak again related that the headaches had lasted approximately one-and-one-half years and described the headaches as "bubble-like pain" behind the right eye, with "radiation to top of head" and "sharp shooting pain in that location." Antoine recommended that Hudak be referred for a psychiatric examination.

Hudak's headaches apparently continued. On April 21, Dr. Antoine reported that Hudak requested to be continued on Motrin for his chronic headaches, but also noted that the headaches seemed to be responding to Zoloft, an antidepressant prescribed for Hudak approximately three weeks earlier. On May 7, Hudak was told by someone on clinic staff that the Motrin might have side effects but he insisted on taking it because of his headaches. On May 22, while coming to Dr. Miller for a shoulder problem, he again requested Motrin for headaches. Hudak's last visit to the Rockland clinic was on June 9, again complaining to Dr. Antoine of headaches. Hudak was transferred from Rockland on June 14, 1995.

Upon his departure from the Rockland County Correctional Facility in June of 1995, plaintiff was transferred to the Downstate Correctional Facility, where he stayed approximately one to two months. While at Downstate, Hudak sought medical attention approximately 4 times for his headaches, but no testing was performed. After a transfer to and approximately two-week stay at Green Haven Correctional Facility, Hudak was transferred in August 1995 to the Mid–Orange Correctional Facility.

While an inmate at Mid–Orange, the plaintiff continued to experience similar headaches, of which he complained approximately seven times to the prison medical staff. Hudak finally filed a grievance asking to be sent to a neurologist, which was ultimately granted and he was sent out on December 1 for a CT scan. This scan revealed a possible aneurysm, so Hudak was admitted to St. Agnes Hospital on December 11 for further testing. CT and MRI scans confirmed a large aneurysm on the right side of Hudak's brain, and Hudak was returned to Mid–Orange on December 28 to await decision on how to treat the aneurysm. On February 14, 1996, Hudak was admitted to Columbia Presbyterian Hospital for repair of the aneurysm. Hudak underwent successful surgery to contain the aneurysm at Columbia Presbyterian

Hospital on February 20, 1996, and has experienced only what he describes as "normal" headaches since then.

### DISCUSSION

#### I. Standard for Summary Judgment

Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the burden of identifying the evidence that it believes demonstrates the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party satisfies this burden, the nonmoving party must then come forward with "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). If a court determines that the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Porky Products v. Nippon Express U.S.A. Inc.*, 1 F.Supp.2d 227, 229 (S.D.N.Y.1997) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted)).

In determining whether summary judgment is appropriate, the Court resolves all ambiguities and draws all reasonable inferences against the moving party. *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997). Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court's role on a motion for summary judgment is "not to resolve disputed issues of fact but to access whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Insurance Co.* 804 F.2d 9, 11 (2d Cir.1986) (citing *Anderson v. Liber-*

*ty Lobby Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

■ In order to properly plead a damage claim under 42 U.S.C. § 1983, the plaintiff must allege the defendant's direct or personal involvement in depriving the plaintiff of a federal constitutional right. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.1994); *Vento v. Lord* 1997 WL 431140, *5 (S.D.N.Y.). In the present case, the plaintiff alleges that defendant denied him adequate medical treatment in violation of his Eighth Amendment rights.

#### II. The Eighth Amendment Claim

■ To succeed in asserting an Eighth Amendment claim based upon inadequate medical treatment, the plaintiff must establish that the defendant was deliberately indifferent to his serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). A deliberate indifference claim contains both an objective and a subjective element. *See Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir.1998); *Hathaway v. Coughlin* 99 F.3d 550, 552 (2d. Cir.1996).

The objective component of a deliberate indifference claim requires that the plaintiff's alleged deprivation be "sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hemmings*, 134 F.3d at 108 (quoting *Hathaway*, 99 F.3d at 553). The parties do not dispute that Hudak's brain aneurysm—a condition that both produced chronic pain and also subjected him to the risk of a serious brain hemorrhage—was "sufficiently serious" to satisfy the objective element of Hudak's claim. At dispute in this case is Dr. Miller's state of mind—i.e., whether he was deliberately indifferent to Hudak's medical needs.

To meet his burden on this element, Hudak must prove that Dr. Miller "kn[ew] of and disregard[ed] an excessive risk to [Hudak's] health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994). "The official must both be aware of facts from which the inference could be drawn that a substantial risk of

serious harm exists, and he must also draw the inference." *Id.* The standard of deliberate indifference equates to that of criminal recklessness. *See id.* 511 U.S. at 836–40, 114 S.Ct. at 1978–80; *Hemmings,* 134 F.3d at 108.

It is not enough, of course, under this test for Hudak to show that Dr. Miller was negligent—i.e., that his treatment of Hudak fell below that expected of a reasonable physician. *See Farmer,* 511 U.S. at 835, 114 S.Ct. at 1978 ("Eighth Amendment liability requires 'more than ordinary lack of due care for the prisoner's interests or safety.'") (quoting *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084); *Hathaway,* 99 F.3d at 553 ("[M]ere allegations of negligent malpractice do not state a claim of deliberate indifference"). Nor would it suffice to prove that Dr. Miller disregarded a risk of which he *should* have been aware—a standard more akin to civil than criminal recklessness. *See Farmer,* 511 U.S. at 836–37, 114 S.Ct. at 1978–79. Along these lines, it is not enough that the risk which was disregarded be an obvious one—actual, subjective knowledge of that risk must be proven. *See id.* at 511 U.S. 840–43, 114 S.Ct. at 1980–82.

However, as noted in *Farmer,* it is important not to confuse the burden of proof with the evidence from which that burden might be met. *See id.* 511 U.S. at 842, 114 S.Ct. at 1981. That is, although Hudak must prove that Miller actually knew of the risk, and not simply that the risk was an obvious one, evidence that the risk was obvious may suffice to allow a factfinder to infer actual knowledge from that obviousness. "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* Thus, if the evidence shows that the risk of serious medi-

cal problems was so obvious that a reasonable factfinder could infer actual knowledge of them on Dr. Miler's part, this Court must deny summary judgment. *Cf. Hemmings,* 134 F.3d at 109 (claim that symptoms of severe injury were easily observable and "classic" sufficient to survive motion to dismiss on subjective prong).

It should be noted that the knowledge which Hudak must show Dr. Miller had is not that Hudak had a brain aneurysm—there is, quite clearly, no evidence of that because it was not discovered until well after his transfer from Rockland—but rather that Miller knew that Hudak had some serious medical problem which bore further investigation. A defendant may not escape liability if the evidence shows that he "merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." *Farmer,* 511 U.S. at 843 n. 8, 114 S.Ct. at 1982 n. 8.

Hudak has presented no "direct" evidence of Miller's knowledge. That is, there is no evidence, either in Miller's notes, or from his deposition, which suggests that Miller knew a serious problem existed. Hudak points to Dr. Miller's statement in his deposition that "inmates are hostile" as evidence of a bias against inmates on Miller's part, but this statement does not support such a conclusion.[1] Read in context, Dr. Miller's statement is simply that diagnosis in the prison context is complicated by the fact that prisoners are often hostile and their complaints and history are therefore sometimes unreliable. Regardless of whether this statement shows any bias or not, it nonetheless says nothing about Dr. Miller's knowledge of serious risks to Hudak's health.

---

**1.** The full statement is as follows:

> Q [by Hudak's counsel]: Do you believe that you gave Mr. Hudak the same treatment you would give any patient you treated and that you did not treat him different because he was an inmate of a correctional institution?
> A [Dr. Miller]: It's not a question of treating somebody differently. A jail setting is different. And there are different aspects to it.
> Q: And when you say "different aspects," what do you mean?

> A: Inmates are—how shall I say it—they are hostile. They are often unable to express themselves. They are inarticulate, in some ways. Makes history very difficult to obtain. History is often unreliable, because there is secondary gain.
> And by the way, there are patients like this in private practice. Those patients would be very similar. So if there was a similar patient in private practice, they would be treated exactly the same way.
> Miller Dep. (Def.Mot.Exh.F), at 74–76.

For his part, Dr. Miller states that he believed, based on the evidence before him, the headaches were "tension headaches" caused by stress and not by some underlying organic problem. These statements also appear in his notes on the patient's chart. However, such a clearly self-serving assertion cannot suffice to defeat Hudak's claim if the facts indicate that the risk of serious medical problem was so obvious that Miller must have known about it.

Further, Dr. Miller asserts that he did, in fact, treat Hudak every time he came in, and points to the fact that he conducted a neurological examination on Hudak as evidence that he was not deliberately indifferent. However, the mere fact that the plaintiff was treated in some manner, while it may "substantially weaken[ ]" his claim, see Hemmings, 134 F.3d at 108–09, does not foreclose a finding of deliberate indifference if Miller knew that this treatment was inadequate. See id. 134 F.3d at 109 (refusing to dismiss case despite fact that plaintiff did receive some medical treatment).

The facts, read in the light most favorable to Hudak as the nonmovant, indicate the following was known to Dr. Miller.[2] During the entire time of his incarceration at Rockland, Hudak was experiencing chronic headaches at a frequency of about three times a week. The headaches consisted of a sharp, throbbing pain behind the right eye and were also described as feeling like "bubbles" going to the top of Hudak's head. Hudak had no particular complaints of stress beyond the stress that one assumes normally accompanies incarceration of any kind. Hudak was taking large doses of pain relievers on a more or less continuous basis to deal with the headaches. A neurological exam indicated no significant problems with the central nervous system but both Miler and Antoine understood the headaches were not typical migraines.

The parties have offered battling expert affidavits on this motion, but these affidavits are largely unhelpful. Dr. Miller has produced an affidavit from Dr. Jerome Block, asserting that upon his review of the case files his opinion is that Dr. Miller's care was within acceptable standards. Hudak, for his part, has produced an affidavit from Dr. Raphael Cilentro stating the opposite opinion. Cilentro's opinion that Miller was negligent is, quite clearly, irrelevant to the issue of whether Miller was deliberately indifferent.[3] However, while a jury which found that Dr. Miller's care was not negligent would necessarily be foreclosed from finding deliberate indifference, Dr. Block's opinion that Dr. Miller's care was reasonable does not foreclose a reasonable jury's right to find conclude otherwise on the basis of the totality of circumstances in the case.

Similarly, even if it could be argued, as Miller does, that Antoine did not recognize the seriousness of Hudak's condition and therefore it cannot be said that Miller (with access to the same facts) must have had actual knowledge, there remains the countervailing fact that the officials at Mid–Orange, upon reviewing Hudak's grievance and upon essentially the same factual record, reached the conclusion that further investigation and testing was warranted.

Were this a case of intermittent complaints over a short period of time, this Court would have no problem deciding that any inference of actual knowledge by a jury would be sheer speculation and would grant summary judgment for the defendant. However, the facts of this case are a much closer call. We have, in essence, a case of chronic headaches, consisting of sharp or "bubbling" pain behind the right eye, over an approximately eight month period, with no evidence of unusual stress or neurological damage, and evidence of two doctors concluding that these head-

2. Dr. Miller stated at his deposition that whenever he would see a patient, he would look at the notes recorded on the patient's clinical progress record—i.e., the notes made by other doctors or nurses. See Miller Dep. (Def.Mot.Exh.F), at 33. Hence, a factfinder could rationally conclude that Miller had knowledge of all the facts recorded on that progress record.

3. The parties' submissions to the Court did not adequately address the relationship between the obviousness of a condition and knowledge of that condition. The Court presumes at trial plaintiff will attempt to elicit more detail from Dr. Cilentro to assist the jury in assessing the obviousness and necessary knowledge component of its claim.

aches were atypical for migraines. On these facts, this Court cannot say that a jury, after hearing Dr. Miller's testimony, the testimony of other experts, and free to judge the credibility of these witnesses, which believed that Dr. Miller *must* have known something was seriously wrong but chose not to investigate or test further would be behaving irrationally or on sheer speculation. Therefore, Hudak has successfully raised a fact issue as to Dr. Miller's knowledge of the seriousness of Hudak's condition, and summary judgment is improper.

### CONCLUSION

For the foregoing reasons the Court denies the defendant's motion for summary judgment. The parties are instructed to appear at a pretrial conference on September 8, 1998, at 4:30 p.m., to discuss the scheduling of a pretrial order and a trial date. The parties are reminded to speak to their witnesses and experts before the conference about availability from October 1998 to the end of the year.

**SO ORDERED.**