**Aaron Leon BURNETTE, Plaintiff,**

v.

**Mike KENNAMORE, et al., Defendants.**

**Civil No. 06–1241–JDB.**

United States District Court, W.D. Tennessee, Eastern Division.

Feb. 19, 2009.

Aaron Leon Burnette, Jr., Henning, TN, pro se.

Rebecca Lyford, Attorney General's Office, Nashville, TN, Milton Dale Conder, Jr., Rainey Kizer Reviere & Bell, Jackson, TN, for Defendants.

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY 38) ORDER OF DISMISSAL ORDER DENYING MOTION TO DISMISS AS MOOT (DOCKET ENTRY 25) AND ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH

J. DANIEL BREEN, District Judge.

On November 13, 2006, Plaintiff Aaron Leon Burnette, Jr. filed a *pro se* complaint pursuant to 42 U.S.C. § 1983 alleging that Defendants Mike Kennamore, Arness Bowden, John Doolen, and Steven Stanley kicked, stomped, and beat him during and after his arrest on November 10, 2005. (Docket Entry ("D.E.") 1). Kennamore worked as a deputy by the Hardeman County Sheriff's Office; Bowden was employed by the Middleton Police Department; and Doolen and Stanley were employees of the City of Whiteville as police officers. By previous order, the Court dismissed Burnette's claims against Bowden due to Plaintiff's failure to effect service within 120 days of the Court's service order.

Kennamore filed an answer to Plaintiff's complaint on June 16, 2008. (D.E. 20). Doolen and Stanley submitted a joint answer to Plaintiff's Complaint on June 19, 2008. (D.E. 22). On June 30, 2008, Doolen and Stanley filed a Fed.R.Civ.P. 12(b)(6) motion to dismiss the complaint for Plaintiff's failure to state a claim upon which relief could be granted. (D.E. 25). Burnette has not responded to the motion to dismiss.

On September 15, 2008, Doolen moved for summary judgment under Rule 56, Federal Rules of Civil Procedure, along with a supporting memorandum. [D.E. 38]. To date, Burnette has not responded to the dispositive motion.[1] On January 5, 2009, Burnette filed an excerpt from the Tennessee Criminal Court of Appeals opinion in his underlying criminal case and a portion of a newspaper article concerning an incident in Milwaukee, Wisconsin. The newspaper article is not germane to the facts of this case. However, the Court will consider the Court of Criminal Appeals opinion as a whole in ruling on the motion for summary judgment.

Kennamore and Stanley have not joined with Doolen in his motion for summary judgment. Nonetheless, the Court is required under 28 U.S.C. § 1915A(b)(1) and 28 U.S.C. § 1915(e)(2)(B)(ii) to dismiss a complaint, at any time, if it fails to state a claim upon which relief may be granted. The basis for Doolen's motion for summary judgment and the Court's analysis of that motion are equally applicable to and dispositive of Plaintiff's claims against Kennamore and Stanley.

1. Local Rule 7.2(a)(2) requires that the response to a motion and its supporting memorandum shall be filed within fifteen days after service of the motion, and that failure to respond timely to any motion, other than one requesting dismissal of a claim or action, may be deemed good grounds for granting the motion. In the case of a motion for summary judgment and a motion to dismiss pursuant to Fed.R.Civ.P. 12(b), a response must be filed within thirty days after service of the motion.

The Court has reviewed the entire record, including Plaintiff's complaint, verified in compliance with 28 U.S.C. § 1746, Defendants' answers, and Doolen's motion for summary judgment and memorandum in support.

## I. STATEMENT OF UNDISPUTED FACTS

A Hardeman County, Tennessee Circuit Court jury convicted Burnette of aggravated assault with a deadly weapon, vandalism of property, and evading arrest while operating a motor vehicle. The Court adopts the following summary of facts and testimony from the appellate opinion of Burnette's underlying criminal convictions as undisputed in this case:

Middleton Police Sergeant Arness Bowden testified that on the night of November 9, 2005, he was on patrol and saw a semi-tractor truck that was not towing a trailer at the intersection of Highways 125 and 57. The truck was traveling south on Highway 125 and had working brake lights but no taillights. Sergeant Bowden got behind the truck to initiate a stop for the taillight violation and turned on his patrol car's blue lights. The truck continued traveling on Highway 125, turned right onto Pine Crest Road, and pulled to the right side of the road. The truck did not stop but continued to roll forward slowly. The truck then accelerated "at full pace" and turned left onto South West Lane. Sergeant Bowden continued to follow the truck and saw the truck's reverse lights turn on. The truck started moving backward, and Sergeant Bowden put his patrol car into reverse, backed up, and pulled over into someone's yard. The truck backed up beside the patrol car, and Sergeant Bowden pulled forward and drove to the left of the truck in order to get out of its way.

Sergeant Bowden testified that he pulled back onto South West Lane, looked in his rearview mirror, and saw the truck moving forward. The officer knew that South West Lane was a dead-end road with an area to turn around at the end. He drove to the end of the road, turned around, and waited to see if the truck was going to drive by. When the truck did not come to the end of the road, Sergeant Bowden drove back along South West Lane. He traveled about one-half mile and saw the truck sitting in the middle of the road with its headlights turned on. Sergeant Bowden pulled his patrol car up to the truck and stopped five to ten feet away. The vehicles were facing each other. Sergeant Bowden saw the truck rock forward and immediately put his patrol car into reverse. He drove backward, pulled off to the left of the road, and rolled out of the car. As he hit the ground, the truck hit the front of his patrol car. Sergeant Bowden ran to the nearest tree and ordered the truck's driver out of the semi-tractor. The truck backed away from the patrol car, turned in Sergeant Bowden's direction, and began to move toward the officer. Sergeant Bowden thought the truck was going to run him down, feared for his life, and began shooting at the truck. He stated that he fired thirteen shots, using ten rounds from his first ammunition clip and three rounds from his second clip.

Sergeant Bowden testified that the truck stopped moving forward and that he stopped shooting at it. The dome light inside the truck turned on, and Sergeant Bowden recognized the driver as the appellant. He yelled for the driver to get out, but the truck backed up, turned around, and headed back on South West Lane toward Pine Crest Road. Sergeant Bowden stated that his patrol car sustained extensive front-end damage, that the car was not repaired, and that the city replaced it.

On cross-examination, Sergeant Bowden testified that he first turned on his blue lights to stop the truck about six-tenths of a mile before the truck got to Pine Crest Road. He acknowledged that at the appellant's preliminary hearing, he testified that he first turned on his blue lights at Pine Crest Road. He stated that his siren was not turned on and that he only wanted to stop the truck for the taillight violation. When the truck did not stop, Sergeant Bowden radioed to dispatch that he was attempting to stop an eighteen-wheeler truck. After the truck crashed into Sergeant Bowden's patrol car, the truck drove into the wooded area where Sergeant Bowden was standing, and Sergeant Bowden began shooting at the truck. He acknowledged that he was not injured during the incident, that he shot at the truck's driver's area, and that he was "shooting to kill." He stated that he did not fire any shots at the truck's passenger side or at the driver's side door.

Investigator Trent Wilbanks of the Hardeman County Sheriff's Department testified that at 10:32 p.m. on November 9, 2005, he was on duty and responded to Sergeant Bowden's radio call for assistance. Investigator Wilbanks went to South West Lane and saw a Middleton police car several feet off the road and backed a few feet away from a tree. The car's front end was "tore up," and Sergeant Bowden was in a wooded area. Investigator Wilbanks stated that both of the patrol car's airbags had deployed and that the car looked like something had hit it. The appellant's semi-tractor truck was recovered the next day in McNairy County.

On cross-examination, Investigator Wilbanks testified that an area where vehicles could turn around was at the end of South West Lane and that the area was big enough for a bus to turn around. He did not see any damage to the back of Sergeant Bowden's patrol car and recovered two bullets from the semi-tractor. He also saw "quite a few" bullet holes in the tractor, including at least two holes above the windshield. He acknowledged that most of the holes were in the front of the semi-tractor and on the passenger side, and he did not remember seeing any holes in the driver's side door or the rear of the truck. From photographs introduced into evidence at trial, Investigator Wilbanks counted thirteen bullet holes in the truck. He acknowledged that the truck's front bumper was slightly damaged and that the front license plate was slightly dented. On redirect examination, he acknowledged that one bullet could have made more than one hole.

William Monroe Jordan testified that he was the Middleton Police Chief at the time of the incident and went to the scene on November 9. The City of Middleton owned Sergeant Bowden's patrol car, a 1999 Ford Crown Victoria. The car was a total loss and was valued between six thousand two hundred dollars and six thousand seven hundred dollars. On cross-examination, Jordan testified that the city had purchased the car from the City of Lexington for two thousand five hundred dollars but had installed a lot of equipment in the car.

Deputy Robert Hitchorn of the McNairy County Sheriff's Department testified that on November 10, 2005, he heard a "be-on-the-lookout" (BOLO) over his radio. As a result, he began looking for a maroon semi-tractor with no working taillights and found the vehicle. The appellant was driving, and the truck's taillights were not working. On cross-examination, Deputy Hitchorn acknowledged that he turned on his blue lights and that the appellant stopped the truck.

Eva Jones, the Personnel Manager for Trans Carriers, testified for the appel-

lant that the appellant leased a truck to Trans Carriers and was an owner/operator for the company. She stated that she kept records for Trans Carriers and that an October 24, 2005 inspection report for the appellant's truck showed that an inspector found a defect in the truck's two "marker lights." According to the report, a follow-up inspection was conducted on October 27, 2005, and a technician signed the report, stating that everything had been corrected. The inspection did not show any problem with the truck's taillights. The truck was inspected again on November 2, 2005, and the lights were checked "okay." On cross-examination, Jones testified that she had nothing to show the lights were working properly on November 9.

Connie Braswell, the appellant's sister, testified that on the night of November 9, 2005, she had been visiting her mother's home on South West Lane. She left her mother's house and drove north on Highway 125. She saw the appellant's truck traveling south and noticed a police car behind it. After she passed the appellant's truck and the patrol car, she looked in her rearview mirror and saw that the truck's taillights were working and that the police officer's blue lights were not turned on. She did not notice anything unusual and drove home. On December 28, 2005, Braswell videotaped the appellant's truck in a storage yard, and the videotape showed that the truck's taillights worked properly.

Margie Burnette, the appellant's mother, testified that she lived at 320 South West Lane. On the night of November 9, 2005, the appellant was supposed to stop by her house in order to pick up some documents. Between 9:00 and 10:00 p.m., she looked out her bedroom window and saw the appellant's truck pulled over to the edge of her driveway. The truck was stopped, and a police car with flashing blue lights was behind it. The police car drove around the truck and toward the end of South West Lane. Burnette stated that the appellant usually used the turn-around area at the end of the road to turn his truck around and that the appellant's truck headed toward the end of the road. Burnette went to her front door, heard the truck stop, and heard five gunshots. A few minutes later, the appellant's truck drove by Burnette's house and headed toward Pine Crest Road. Burnette stated that she did not hear a collision and acknowledged that more than five shots could have been fired. She said the appellant was proud of the semi-tractor and "was real particular" about it. On December 28, 2005, Burnette went with her daughter to videotape the truck in a storage yard. The truck was locked behind gates, and its taillights were working. On cross-examination, Burnette testified that although the appellant was supposed to pick up some documents from her on the night of November 9, he never stopped to get the documents.

Teresa Poindexter testified that she used to date the appellant and traveled with him in his semi-tractor as an authorized passenger. On the night of November 9, 2005, the appellant stopped by her house. They were supposed to "go on the road" the next day, and they inspected the appellant's truck. All of the lights on the truck worked. The appellant left Poindexter's house but returned later that night. The next day, Poindexter was riding with the appellant in the truck when the police stopped him. To her knowledge, the semi-tractor's taillights were still working at that time.

On cross-examination, Poindexter acknowledged that in a prior hearing, she testified that when the appellant first came to her home on November 9, a seventy-five-foot trailer was attached to the semi-tractor. During Poindexter's

and the appellant's inspection of the truck, Poindexter was standing behind the trailer. She acknowledged that the trailer was between her and the semi-tractor's taillights and that she did not keep a log of the appellant's truck inspections.

The appellant testified that when he saw the blue lights, he "slowed to the right cause I wasn't sure ... that he was after me." The police car stopped at the first house on Pine Crest Road and did not pull up behind the appellant. The appellant believed the officer was answering a call at the house and drove toward his mother's house on South West Lane. As he got to the last curve in the road, the officer "flew up behind me and turned his lights on." The appellant slowed down and pulled over near his mother's driveway. The patrol car backed up and pulled into a yard, and the appellant did not move the tractor because he did not know what the officer was doing. The patrol car then went around his truck like he was going to a fire and disappeared. The appellant waited, but the officer did not return. The appellant drove toward the end of South West Lane in order to turn the truck around at the end of the road, which was his normal practice. He saw that Sergeant Bowden's patrol car was in the edge of the woods and that none of the car's lights were on. Sergeant Bowden turned on his car's lights, and the appellant started coasting over [there] to the side to see what he wanted. Sergeant Bowden got out of the patrol car, ran toward the woods, and fired four or five rounds into the front of the appellant's truck. The appellant did not know why the officer was shooting at him and duck[ed] down out of the way. The appellant's truck rolled into the corner of the patrol car and stopped. He stated that he did not intentionally hit the officer's car and did everything he could to avoid making contact with the officer and the car.

The appellant testified that Sergeant Bowden was trying to kill him and that one of the shots struck him in the forehead. As Sergeant Bowden was loading his gun with another ammunition clip, the appellant backed the truck away. The officer shot three or four more times into the truck, striking the passenger side. As the appellant drove away, the officer shot into the back of the truck. The appellant returned to Poindexter's house and later counted seventeen bullet holes in his truck. **He identified a photograph taken of him when he was arrested on November 10, 2005, and said the photograph showed a bullet wound on his head and dried blood. He said police officers beat him on November 10.**

On cross-examination, the appellant testified that Sergeant Bowden did not turn on his blue lights until half-way between Pine Crest Road and South West Lane. The appellant acknowledged that he continued driving and turned onto South West Lane. He stopped on South West Lane in front of his mother's house, and Sergeant Bowden drove around him at a high rate of speed. The appellant did not go into his mother's house because he was waiting to see what the officer was going to do. The appellant then drove toward the end of South West Lane so that he could turn the truck around and stop by his mother's house. **He denied that the dried blood in the photograph was a result of a struggle he got into with police officers on November 10 and said that he never went to the hospital for treatment.** Investigator Mike Kennamore of the Hardeman County Sheriff's Department testified as a rebuttal witness for the State that he responded to the scene when the appellant was arrested on November 10. **At that time, no marks**

**were on the appellant's head. An altercation with the appellant occurred, resulting in the marks on his head that appeared in the photograph.** Investigator Kennamore stated that the driver's glass on the truck was intact. Although the appellant had been charged with attempted second degree murder, aggravated assault with a deadly weapon, vandalism, and evading arrest while operating a motor vehicle, the jury convicted him only of the latter three offenses.

*State v. Burnette,* 2007 WL 2822906, *1–*5 (Tenn.Crim.App.2007) (emphasis added).

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) states that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "In considering a motion for summary judgment, the court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party." *60 Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir.1987). *See also Kochins v. Linden–Alimak, Inc.,* 799 F.2d 1128, 1133 (6th Cir.1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party; if the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When ruling on a motion for summary judgment, mere existence of a scintilla of evidence in support of the plaintiff's position will not be sufficient; there must be evidence on which the jury could reasonably find for the plaintiff. *Id.*

Federal Rule of Civil Procedure 56(e) further states that, "when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Rule 56(e) requires the opposing party to go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## III. ANALYSIS

█ The Eighth Amendment prohibits cruel and unusual punishment. *See generally Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). An Eighth Amendment claim consists of both objective and subjective components. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Hudson v. McMillian,* 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Wilson,* 501 U.S. at 298, 111 S.Ct. 2321; *Brooks v. Celeste,* 39 F.3d 125, 127–28 (6th Cir.1994); *Hunt v. Reynolds,* 974 F.2d 734, 735 (6th Cir.1992).

█ The United States Supreme Court has also clarified the subjective component—the intent of the prison official. *See, e.g., Farmer,* 511 U.S. at 834, 114 S.Ct. 1970; *Brooks,* 39 F.3d at 128. *Cf. Wilson,* 501 U.S. at 302–03, 111 S.Ct. 2321; *Caldwell v. Moore,* 968 F.2d 595, 602 (6th Cir.1992). The subjective component requires that the official act with the requisite intent, that is, that the official have a "sufficiently culpable state of mind."

*Farmer,* 511 U.S. at 834, 114 S.Ct. 1970; *Wilson,* 501 U.S. at 297, 302–03, 111 S.Ct. 2321. The official's intent must rise at least to the level of deliberate indifference. *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970; *Wilson,* 501 U.S. at 303, 111 S.Ct. 2321.

 The Eighth Amendment proscription on cruel and unusual punishment also encompasses an inmate's right to be free from excessive force. *Hudson,* 503 U.S. at 6–7, 112 S.Ct. 995; *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973). In the context of excessive force, the objective and subjective components of Eighth Amendment analysis merge into a single inquiry because "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson,* 503 U.S. at 9, 112 S.Ct. 995. Thus, the relevant inquiry in any excessive force claim is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Whitley v. Albers,* 475 U.S. 312, 320–21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).

 In determining whether the force was applied in a malicious or sadistic manner, the Court should consider such factors as the need for the application of the force, the amount of force used, and the extent of the injury inflicted. *Whitley,* 475 U.S. at 319, 106 S.Ct. 1078. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Johnson,* 481 F.2d at 1033. Indeed, prison officials are entitled to use physical force, including personal restraint weapons, to compel obedience by inmates. *See, e.g., Caldwell v. Moore,* 968 F.2d 595, 602 (6th Cir.1992). Moreover, the reasonableness of the use of force must be viewed within the context in which it occurred. Thus, greater force may be reasonable when used in response to a serious disturbance.

 Prison officials are entitled to use physical force, including devices such as tear gas, to compel obedience by inmates. *See, e.g., Caldwell,* 968 F.2d at 602. Furthermore, the reasonableness of force depends on the circumstances under which it is used. A guard's use of a chemical agent or physical force to restore order and discipline is presumptively reasonable so long as no injury is inflicted.

 Burnette's original complaint alleges that he was handcuffed and "combat restrained" by an unidentified officer who "started kicking me, stomping me, and beating me with their [sic] fist and metal objects." (D.E. 1, pp. 5–6). He also claims that upon arrival at the Middleton Police Department, he was "pulled from the police car and thrown to the ground again to where I was beating [sic], drugged, stompted [sic], and kicked over and over again." (*Id.,* p. 6) Plaintiff further contends that he was beaten again after being placed in a cell at the Hardeman County Sheriff's Department, was covered in blood, suffered from broken ribs, and left naked in a cell after being refused medical treatment. (*Id.*)

Burnette filed an amended complaint in which he averred that Kennamore was the officer who placed him in handcuffs, restrained his feet, kicked him, stomped him, and beat him with fists and a metal object. (D.E. 8, p. 2). Plaintiff alleges that Doolen and Stanley kicked and beat him upon his arrival at the Middleton Police Department. (*Id.*) Burnette does not identify which Defendants allegedly "continued to kick and hit him with their fists" upon arrival at the Hardeman County Sheriff's Department. (*Id.,* p. 3). He maintains that he was "naked," his "ribs were broken, [ ] chest swelled up, [he] was in great pain and covered with dried up blood & open wounds" and that officers refused to assist him in getting medical help. (*Id.*)

Doolen contends that Plaintiff's verified complaint contradicts a prior admission and that Burnette, therefore, cannot raise a genuine issue of material fact. Doolen relies upon an Inmate Medical Form signed by Burnette upon his admission to the Hardeman County Jail indicating he was not in need of medical assistance. (D.E. 38, Exhibit 1). Doolen also presents an Inmate Assigned Property Form, which Plaintiff signed, indicating he received a jail uniform and blanket upon his arrival at the Jail. The Property Form directly contradicts Plaintiff's assertion that he was left naked in a cold cell. (D.E. 38, Exhibit 2).

Burnette has submitted the paragraph of the state court opinion containing the testimony of Kennamore, who stated that an altercation occurred upon Plaintiff's arrest with the resulting marks on his head appearing in his booking photograph. (D.E. 43). Burnette has not provided any affidavit or document refuting his signatures on the Inmate Medical Form or the Inmate Property Form. He has not provided any photographs of injuries, medical records, or written requests for medical treatment. He also has not provided any affidavit from any witness which supports his contention that he sustained broken ribs or was covered in blood or bruises.

The Court has reviewed the entire appellate opinion. Burnette testified that the dried blood in the booking photograph was from a bullet wound sustained the night before his arrest. Furthermore, Plaintiff denied that the blood was a result of a struggle with the arresting officers on November 10, 2005. Burnette admitted that he never went to the hospital for treatment.

Plaintiff's verified complaint and amended complaint are blatantly contradicted by the record. His allegations in this lawsuit are discredited by his own testimony in the criminal proceedings and Defendant's exhibits. Plaintiff contended during his criminal trial that he was not injured during his arrest, but was shot in the head on the night preceding his arrest. The record reflects, at most, dried blood present on Burnette's forehead at the time he was booked into the Jail; no broken ribs, no swollen chest, and no open wounds. Kennamore, not Plaintiff, testified during the criminal trial that an altercation occurred during Plaintiff's arrest. Even Kennamore's testimony, however, does not establish an Eighth Amendment violation because the record does not demonstrate that Plaintiff sustained any injury during the arrest which was anything more than minimal harm. Nothing in this record contradicts Burnette's signature on the Inmate Medical Form verifying that he did not need medical assistance at the time he arrived at the Jail.

Because no reasonable jury could believe the allegations contained in the complaint and amended complaint, this Court should not adopt that version of the facts in ruling on Defendant's motion for summary judgment. *Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007). There is no affidavit or exhibit in the record demonstrating a wanton and malicious infliction of harm by these Defendants in violation of the Eighth Amendment. Defendant Doolen's motion for summary judgment is GRANTED. (D.E. 38). Plaintiff's complaint is DISMISSED as failing to state a claim against all Defendants. The motion to dismiss Plaintiff's complaint (D.E. 25) filed by Doolen and Stanley is DENIED as moot due to the dismissal of this action. The Clerk is directed to enter judgment for all defendants.

### IV. *APPEALS ISSUES*

■ Twenty-eight U.S.C. § 1915(a)(3) provides that an appeal may not be taken *in forma pauperis* if the trial court certifies in writing that it is not taken in good

faith. The good faith standard is an objective one. *Coppedge v. United States,* 369 U.S. 438, 445, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). An appeal is not taken in good faith if the issue presented is frivolous. *Id.* In this case, for the reasons expressed above, there is no genuine issue of material fact that Plaintiff fails to state a claim upon which relief can be granted. As reasonable jurists could not differ regarding this conclusion, the Court concludes that an appeal of the dismissal of those issues would also be frivolous.

It is therefore CERTIFIED, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal in this matter by Plaintiff would not be taken in good faith, and he may not proceed on appeal *in forma pauperis.*

The final matter to be addressed is the assessment of a filing fee if Burnette appeals the dismissal of this case.[2] The United States Court of Appeals for the Sixth Circuit has held that a certification that an appeal is not taken in good faith does not affect an indigent prisoner plaintiff's ability to take advantage of the installment procedures contained in § 1915(b). *McGore v. Wrigglesworth,* 114 F.3d 601, 610–11 (6th Cir.1997). *McGore* sets out specific procedures for implementing the PLRA. Therefore, the Plaintiff is instructed that if he wishes to take advantage of the installment procedures for paying the appellate filing fee, he must comply with the procedures set out in *McGore* and § 1915(b).

---

2. The fee for docketing an appeal is $450. *See* Judicial Conference Schedule of Fees, § 1, Note following 28 U.S.C. § 1913. Under 28 U.S.C. § 1917, a district court also charges a $5 fee:

> Upon the filing of any separate or joint notice of appeal or application for appeal or upon the receipt of any order allowing, or notice of the allowance of, an appeal or of a writ of certiorari $5 shall be paid to the Clerk of the district court, by the appellant or petitioner.